INSEALATOR, INC., v. WALLACE.

WALLACE v. INSEALATOR, INC.

1. CONTRACTS—COMMISSIONS OF MANUFACTURER'S AGENT—BOOKS AND RECORDS.

Finding of trial court that plaintiff manufacturer's agent had failed to substantiate his claim that defendant corporation had wrongfully manipulated or altered its books and records so as to preclude plaintiff from getting all commissions due him although limited to "50% of the total net profit before taxes" *held*, not against the preponderance of the evidence.

REFERENCES FOR POINTS IN HEADNOTES
[1]  2 Am Jur, Agency § 311.
[2]  3 Am Jur, Appeal and Error § 900.
[3–6]  28 Am Jur, Injunctions §§ 72, 102.
[7]  20 Am Jur, Evidence § 910.
[8]  20 Am Jur, Evidence § 558.
[9]  20 Am Jur, Evidence § 740.
[10]  20 Am Jur, Evidence §§ 418, 430.
[11]  16 Am Jur, Depositions § 114.
[12]  28 Am Jur, Injunctions § 73.
*In camera* trial or hearing and other procedures to safeguard trade secret or the like against undue disclosure in course of civil action involving such secret.  62 ALR2d 509.
[13]  14 Am Jur, Costs § 92.

2. APPEAL AND ERROR—NONJURY CASES—QUESTION OF FACT—PRE-PONDERANCE OF EVIDENCE.

The Supreme Court does not substitute its judgment on questions of fact in a nonjury case unless the evidence clearly preponderates in the opposite direction.

3. INJUNCTION—TRADE SECRETS.

It is essential to a suit to enjoin use of alleged trade secrets by defendant, a manufacturer's agent formerly employed by plaintiff, that plaintiff establish a disclosure in confidence to defendant of certain trade secrets and the wrongful misappropriation of such secrets by defendant to plaintiff's damage.

4. SAME—TRADE SECRET—COMMON KNOWLEDGE.

There must be a trade secret before there can be a betrayal thereof that is the subject of injunctive relief, as the law does not protect knowledge so general as to be common property in the trade.

5. SAME—TRADE SECRET—COMMON KNOWLEDGE.

There is no legally recognizable trade secret in an idea that was well known or easily ascertainable.

6. SAME—TRADE SECRETS—STOP-LEAK.

Plaintiff in suit to enjoin alleged improper use of trade secret by defendant who had been its manufacturer's agent in the sale of a stop-leak product for automobile radiators *held*, to have failed to show that ingredients were the same or were used in the same proportion, that the method of production was unique, that packaging was the same or was sold as plaintiff's product.

7. SAME—EVIDENCE—UNIDENTIFIED DOCUMENT.

Exclusion of document as to method of operation of defendant corporation, not identified as to authorship or time it was drafted, *held*, proper, in suit to enjoin defendant's use of alleged trade secret.

8. SAME—SELF-SERVING DECLARATIONS.

Self-serving declarations were properly excluded in suit to enjoin defendant's use of alleged trade secrets.

9. SAME—TRADE SECRETS—UNIDENTIFIED MODELS.

Exhibits that were not identified as exact models in use at time defendant left employ of plaintiff in suit to enjoin defendant's use of alleged trade secrets were properly excluded.

10. SAME—EVIDENCE—TRADE SECRET—PATENTS.

Exhibit that was shown to have been obtained from the patent office although not certified to by that office was properly admitted to reveal purpose of a patent that had been issued to another person some 27 years before contract had been made between plaintiff and defendant in suit to enjoin latter's use of alleged trade secret.

11. DISCOVERY—DEPOSITIONS CONTAINING IRRELEVANT AND IMMATERIAL MATTER—ADMISSION—IMPEACHMENT.

It was not error for trial court to exclude discovery depositions containing irrelevant and immaterial testimony because of such content when counsel would not accept court's offer to go through them and make a ruling as to the admissibility of testimony therein but insisted on their admission in their entirety under court rule providing for use of such depositions "so far as admissible under the rules of evidence," where opportunity was afforded counsel to use them to contradict or impeach (Court Rule No 35, § 6 [1945]).

12. COURTS—TAKING TESTIMONY IN SECRET—TRADE SECRETS.

It was not error for trial court not to take testimony in secret in the court's chambers in suit to enjoin defendant's use of alleged trade secrets, where it is held that no legal trade secrets, as such, were involved in case.

13. COSTS—CONSOLIDATED CASES—FAILURE OF EITHER APPELLANT TO PREVAIL.

No costs are allowed in suit to enjoin defendant's use of alleged trade secrets consolidated with latter's action against plaintiff for commissions, where both parties have appealed and neither has prevailed in his position.

Appeal from Wayne; Fenlon (Edward H.), J., presiding. Submitted June 2, 1959. (Docket No. 11, Calendar No. 47,757.) Decided October 12, 1959.

Bill by Insealator, Inc., a Michigan corporation, against William P. Wallace, the American Waterlock Corporation, an Illinois corporation, and others to enjoin use of secret knowledge, information and ingredients in a manufacturing process. Case consolidated with previously instituted law action by William P. Wallace against Insealator, Inc., for sales

commissions. Bill dismissed. Judgment of no cause of action entered in law case. Plaintiff in chancery appeals and defendants cross-appeal, defendant Wallace asking judgment in law case. Affirmed.

*Butzel, Eaman, Long, Gust & Kennedy* (*Percy M. Lovett, James D. Ritchie* and *Rockwell T. Gust, Jr.,* of counsel), for plaintiff Insealator, Inc.

*Roy S. Lasswell* and *Gordon E. Gable,* for defendant Wallace and others.

KAVANAGH, J. William P. Wallace instituted a law action in the circuit court for Wayne county against Insealator, Inc., for claimed commissions allegedly earned as a manufacturer's agent under contracts with Insealator beginning February 9, 1954, and ending subsequent to discharge of Wallace by Insealator on April 7, 1955.

It is Wallace's position that the commissions have been earned but not paid. Such commissions arose out of sales made by Wallace by delivery of a radiator stop-leak product in the form of pellets in large quantities to automobile manufacturers.

The pertinent contracts are 3 in number and were dated February 9, 1954, June 5, 1954, and December 16, 1954. They are as follows:

"February 9, 1954

*"To whom it may concern:*

"As of February 1st, I have engaged a manufacturers' agent, whose name is W. P. Wallace, who will act as an agent for the Insealator pellets, also all industrial sales of Gasketelper. He will be paid a straight commission of 25% on all gross sales when the money is collected by us, subject to amendment below.

"BAR'S PRODUCTS SUPPLY, INC.

/s/ "FRED D. BARTON

"President

"cc: Mr. Fred D. Barton
    Mr. W. P. Wallace
    Mr. James B. Eaman

"Amendment:

"When total commissions earned have reached $25,000, there will be a modification of the 25% basis. The exact adjustment to be agreed upon at a later date."

"June 5, 1954

"Supplement to replace memorandum agreement under date of February 9, 1954

"Re: William P. Wallace

"1. William P. Wallace will act as an agent for the sale of Insealator pellets and also for all industrial sales of Gasketelper.

"2. Mr. Wallace's territory coincides with that of Bar's Products Supply, Inc., and thus excludes the territory serviced by Bar's Products, Inc. (a California corporation).

"3. Mr. Wallace will be paid a straight commission of 25% on all of his gross sales to the automotive and engine manufacturers alone. Engine and/or motor rebuilders are specifically excluded.

"4. Mr. Wallace will receive a commission of 5% on sales to automotive manufacturers of Bar's Leaks under private label, excepting sales to Buick Motor Division, General Motors Corporation.

"5. The above commissions will be paid when the money is collected by us, following completion of the sale.

"6. Total commissions earned will be paid at the rate of 25%, will (*sic*) the exception as noted in paragraph 4, and with the additional condition that the total commissions paid Mr. Wallace cannot exceed 50% of the total net profit after taxes of Insealator, Incorporated.

"INSEALATOR, INCORPORATED
            /s/ "FRED D. BARTON,
            "President

"Approved:
/s/ "WILLIAM P. WALLACE"

"December 16, 1954

"Supplement to replace memo agreements under dates of February 9, 1954 and April 19, 1954. Re: W. P. Wallace

"W. P. Wallace will act as an agent for the Insealator pellets, also all industrial sales of Gasketelper. He will be paid a straight commission of 25% on all gross sales to the automotive manufacturers alone. Rebuilders are specifically excluded. W. P. Wallace will receive a commission of 5% on sale of Bar's Leaks under private label to the automotive manufacturers alone, with the exception of Buick business.

"The above commission will be paid when the money is collected by us. Completed sale only.

"This agreement is applicable to the territory covered in the continental United States by Bar's Products Supply, Inc. and Insealator, Inc., with the exception of the territory covered by the California corporations, Bar's Products, Inc., and Bar's Leaks Western, both located at 226 South 24th street, San Jose, California, and W. P. Wallace waives right to commissions on shipments of Insealator pellets made in the territory of the above corporations which covers the Pacific coast territory only.

"When the total commission earned have reached $25,000 per year there will be a nodification (sic) of the 25% basis on Gasketelper and and (sic) Insealator pellets by mutual agreement.

"Under no circumstances can the total commission exceed 50% of the total net profit before taxes of Insealator, Incorporated.

"Bar's Products Supply, Inc.
/s/ "Fred D. Barton,
"President.

"Approved
/s/ "W. P. Wallace"

It is to be noted that under the February 9, 1954, contract Wallace's total commissions were limited by the following factors: (1) 25% of gross sales when money is collected, subject to an amendment as

follows:   When total commissions earned reach $25,000, there will be a modification of the 25% basis. Under the June 5, 1954, contract the limitations were as follows:   (1) Commissions of 25% on all gross sales to automotive and engine manufacturers alone; (2) Commission of 5% on sale of Bar's Leaks, with a certain designated exception; (3) Money must first be collected and sale completed; (4) Total commissions cannot exceed 50% of the total net profit of Insealator after taxes.   The December 16, 1954, contract contained the following commission limitations: (1) 25% on all gross sales to automotive manufacturers alone; 5% on sale of Bar's Leaks to automotive manufacturers alone, with one exception; (2) Money must first be collected and sale completed; (3) Agreement does not cover sales in the Pacific coast territory covered by Insealator's California corporations; (4) When total commissions reach $25,000 there will be a mutually agreed upon modification of the 25% basis; (5) Total commissions cannot exceed 50% of the total net profit of Insealator before taxes.

Fred D. Barton executed the required contracts on behalf of Insealator, Inc., a Michigan corporation, whose stock he controlled.   Insealator manufactured the pellets under license granted to it by another corporation whose stock was also controlled by Mr. Barton.

In this action for claimed commissions, defense is made by Insealator that Wallace has forfeited his right to commissions because of his activity while a manufacturer's agent for Insealator in helping organize a competitive corporation, American Waterlock Corporation, and using the information gained as trade secrets for his own benefit as a stockholder of the rival in the field of stop-leakage products.

Subsequent to the filing of Wallace's action for commissions, Insealator filed a bill in chancery seek-

ing injunctive relief and damages against Wallace and the American Waterlock Corporation. The chancery action was predicated upon an alleged confidential relationship between Wallace and Barton, breached by Wallace's appropriation to his own benefit of information of trade secrets entrusted to Wallace. It is claimed circumstances show bad faith in said use, calling forth equitable jurisdiction to declare an implied trust for the benefit of Insealator in the unjust enrichment and gains made by Wallace.

It is the contention of Wallace, as defendant in the chancery action, that no trade secrets were involved; that no confidential relationship existed between Wallace, Insealator, and Barton; that the alleged trade secrets were all available to the public through the registering of Barton's patent, and the source of the material used and the combination of it had been used in the trade for years; that the claimed development of an extruding machine attachment was nothing unusual and was known to all manufacturers and agents of extruding equipment; that since there was no confidential relationship and no trade secrets involved, plaintiff in the chancery case was not entitled to injunctive relief or damages.

The 2 cases were combined for trial in the Wayne circuit court.

The trial judge, at the conclusion of proofs, rendered a written opinion in which he dismissed the law action for commissions with a 1-paragraph statement in a 20-page opinion to the effect that Wallace had failed by a preponderance of the evidence to substantiate his claim. He entered a judgment of no cause of action in the law case. Likewise, in the chancery case, the trial court held Insealator failed to substantiate its claims for damages or injunctive relief and dismissed plaintiff's bill of complaint. In dismissing the bill of complaint, the trial judge in his

opinion held that the alleged secrets were not trade secrets in the legal sense from which could arise a confidence reposed by Barton in Wallace and breached by him in the competitive field of stop-leakage devices; that the relationship was one for mutual benefit; that there was no misappropriation of information upon which to claim bad faith; that there was no intent by Wallace to wreck Barton's Buick business; that the admitted dealings of the parties negative any possible showing of advantage taken by one at the expense of the other requiring compensation; that with a patent background, Barton cannot impose on Wallace a relationship based on bad faith in departing from the purpose in giving the information, since the purpose was to use the information for a common benefit.

From the order dismissing the bill of complaint and the entry of a judgment of no cause for action in the law case, both parties have appealed.

Appellant Insealator presents 13 individual claims of error by the trial court. Seven of these claims relate directly to the alleged theft of trade secrets. These are 3 through 9, and can be stated in 1 question: Were the use and source of supply, method of mixing, and proportions of materials used in the manufacture of the pellets, and the adaptations and modifications made to the extruding machine trade secrets? The lower court said "no." Appellant claims "yes." The first 2 questions presented by appellant can be stated in one: Was Wallace acting in a confidential and fiduciary capacity and under duty to keep inviolate the confidential disclosures of trade secrets made to him during the course of his employment with Insealator? The lower court said "no." Appellant says "yes." Three other questions have to do with the admission of certain exhibits and depositions in evidence, the lower court either having refused to admit them or admitting some of them

over objection. The last question is: "Should the testimony as to some of the trade secrets have been taken in secret in the court's chambers as requested by appellant's attorney?" The lower court said "no." Appellant claims it should have been accorded this right.

Wallace, on appeal, proposes 4 questions. In each instance Wallace contends the lower court failed to rule on these points. He contends the answers should have been "yes." They are as follows:

"1. Did Wallace prove his case on his contract for commissions earned and unpaid in the amount of $11,252.72 through April 7, 1955 when he was discharged?

"2. Did Wallace prove his case for commissions earned on shipments to Ford, Chevrolet and Nash after the date of his discharge on April 7, 1955 for the unexpired term of original purchase orders for said companies procured by Wallace prior to April 7, 1955?

"3. Does Wallace have a right to commissions based upon a full 5¢ per unit price for the Ford, Chevrolet and Nash purchase orders procured by him prior to April 7, 1955, but completed after said date of discharge?

"4. Were there sufficient profits in Insealator to allow payment to Wallace of all commissions proved regardless of his contract provision limiting his 25% commission to 50% of the total profits of Insealator?"

The determining facts upon which these causes of action stand or fall are as follows.

Fred D. Barton had experimented in the field of rust-proof and stop-leak devices. In 1947 he made application for a patent, which was granted in January, 1952, of a liquid composition which he called "Bar's Leaks." Its basic ingredients were ginger-root flour and soluble oil, with a recommendation that

crushed or ground nut shells, such as almond shells, would constitute a beneficial addition to the preparation. The patent claim sets out the proportions of ginger-root flour and soluble oil as roughly 2 pounds of ginger-root flour to a gallon of soluble oil. The patent search in 1947, when application was made, revealed a patent granted to one Wright on May 3, 1927, for a stop-leak product for radiators, described as follows: "For use in old radiators that may leak due to the solvent action of the solution on crystalized salts that may be present because of the use of bad water or otherwise, there may be introduced a small quantity of commercial ginger or other similar substance to stop or counteract the leak."

The use of ginger-root with its starch content was not new as a stop-leak ingredient. Raw ginger-root before extraction of ginger oil was more expensive than "spent" ginger since the latter is the waste product after extraction of the oil. The source of supply for this "spent" ginger was with the ginger ale companies, principally Canada Dry and Vernor's. Its cost was approximately 5¢ per pound, while the raw root was 35¢ or more per pound. Almond shells were purchased from California almond growers. The binder of soluble oil was purchased on the open market. It was a mixture of these elements that Barton produced in liquid form in a small bottle sold to retail users as "Bar's Leaks."

In about 1952 it was suggested to Barton by an engineer of General Motors that the automobile industry would be interested in such a mixture provided it was furnished in pellet form to be placed in radiators as they came off the production line. Shortly thereafter Barton organized a Michigan corporation known as Insealator, Inc., which began the manufacture of pellets in small quantities. His mechanical process was ineffective. He used a flour mixer and molded the pellets by hand labor. Barton

was not an engineer by training. He needed help, both to sell his pellet product and develop a mechanical process to produce the pellets in large quantities. He met Wallace, a manufacturer's agent, in the Detroit area. Wallace, with some training as a mechanical engineer, had been a sales representative for Perfect Circle Company and as such had sold piston rings to the large automobile companies. He knew their engineers and sales staffs and was in a position to obtain orders from them for the pellets. Wallace entered into an agreement with Insealator to be its manufacturer's agent for the sale of the pellets in accordance with the written agreements dated February 9, 1954, June 5, 1954, and December 16, 1954. Wallace, before meeting Barton, had looked up Barton's patent and had learned the possibilities of Barton's product. Its ingredients were published knowledge and available to all in the business.

As a result of Wallace's sales ability and connection with the automobile companies, Wallace secured blanket orders for pellets from various of the automobile companies.

Barton had no mechanical process of extrusion of his mixture to meet the demand. He could only produce 50,000 pellets per month. The demand exceeded 500,000 per month.

In June, July and August, 1954, Wallace, with his own aide, one Raymond, by mutual understanding with Barton and Insealator, went into Insealator's plant to endeavor to perfect a method of extruding pellets with speed and efficiency. Wallace advanced $1,306 of his own money, which was later repaid by Barton, in the purchase and development of a machine which he hoped would extrude the material faster.

It is to be remembered that Wallace was still a manufacturer's agent. He was not a factory em-

ployee. He went into the plant to assist in finding ways and means to increase production so that the pellets, for which purchase orders had been made, might be delivered and he receive his commission. Barton naturally wanted the production increased so that Insealator could meet the increased orders and insure additional profits.

The mechanical experimentation carried on by Wallace, Raymond, and other employees of Insealator resulted in the mechanical difficulties being solved and pellets produced in quantities sufficient to fill the orders, both parties benefiting therefrom.

It is to be noted that no attempt was made by Insealator or Barton to insist on Wallace signing an agreement to treat any knowledge gained as trade secrets.

Wallace was discharged on April 7, 1955, the reason given being Wallace's use of information gained from his visits to the plant for his personal use and advantage.

It is developed that on January 13, 1955, Wallace, with other friends, organized the American Water-lock Corporation and took a lease at Ortonville, Michigan, where subsequent to April 7, 1955, they began the manufacture of a pellet composed of "spent" ginger-root, powdered almond shells in 4-to-1 mixture, and a liquid binder of 1/3 water, 1/3 alcohol, and 1/3 petronate. These ingredients were purchased on the open market. A wrapping film or sealing product was purchased from Mono-Sol-Corporation, which manufactures such film with a base of "Elvanol" powder purchased from DuPont. Waterlock never used a dip at any time, while Insealator does employ such method of coating its pellets. Waterlock's pellets are wrapped with a film which dissolves when the pellets are submerged in water. Waterlock now puts up a box which it sells to auto manufacturers consisting of a sealing pel-

let for radiators and a chemical pellet for rust inhibiting purposes.

In connection with the claim of Wallace for commissions, Wallace claims $11,252.72 in unpaid commissions from the time of his employment by Insealator until his discharge. A certified public accountant calculated total sales under Wallace's contracts during the period of his association with Insealator at $173,157.93, of which 25% totals $43,289.48. The agreed amount paid during Wallace's employment totaled $32,036.76. Wallace claims the difference of $11,252.72 remains unpaid.

Wallace also alleges his right to commissions due on sales made on purchase orders procured by him prior to his April 7, 1955, discharge by Insealator, but on which shipments and collections were not accomplished until after the discharge. Wallace says figures produced by his certified public accountant witness showed total sales under these contracts of $88,963.25, of which 25% totals $22,281.63 due him. These figures were based on the reduced price-per-pellet charge by Insealator on sales subsequent to Wallace's discharge.

Another element in Wallace's claim for commissions relates to the fact the orders procured by him called for a unit price of 5¢ per pellet. Shortly after Wallace's discharge Insealator voluntarily reduced its price to 4¢ and subsequently to 3¢ per pellet and its gross sales figures were totaled on such reduced price sales. It is Wallace's contention that his commissions on sales made after his discharge on purchase orders procured by him prior to his discharge should be figured on a 5¢ per pellet figure. His 25% would equal in this instance $26,784.17, rather than the $22,281.63 figure stated above. Wallace further claims interest in the amount of $3,327.60 figured at the rate of 5% from the time the commissions became owing to the date of trial. The total

amount of commissions and interest claimed by Wallace to the date of trial amounts to $41,364.46.

Wallace claims Insealator had no right or reason to reduce the price of its pellet subsequent to his discharge, and for that reason his commissions should be computed on the 5¢ figure.

Lastly, it is contended by Wallace that regardless of the contract provisions limiting commissions to 50% of Insealator's total profits, Insealator made sufficient profits to allow payment to Wallace of all of his claimed commissions. Despite the fact that the financial statements of Insealator show a profit, Wallace contends that Insealator changed its method of accounting and increased salaries and expense accounts to employees, together with royalty payments, to show a small profit by Insealator so as to limit Wallace's commissions under the contracts.

It would seem that Wallace's entire claim for commissions is contingent on his producing sufficient proof of Insealator's profits to get around the 50% limitation clause in his contracts.

The trial judge in his opinion held that Wallace's suit failed because he failed by a preponderance of the evidence to substantiate his claim.

There is no question that using the $58,251.11 figure used by counsel in argument, or even the figure of $63,543.51, which would appear as net profits before taxes, as per Insealator's operating statements, and applying to it the 50% commission limitation, Wallace would not have been entitled to any further commissions. By use of his accounting witness, Wallace attempted to show such a change in accounting procedure during the years 1955 and 1956 as compared with 1954 to show an attempt by Insealator to deprive Wallace of additional commissions.

There was testimony that the reason for the payment of employees travel and entertainment expenses was that in 1955 and 1956 Insealator changed

from a manufacturing concern to a selling concern, and a part of this expense was royalties paid to the manufacturing company. The reduction in price from 5¢ per pellet to 4¢ and eventually to 3¢ certainly constituted a significant drop in gross income and profit in 1955 and 1956.

It would appear that the burden rested upon Wallace to show such a deliberate distortion of Insealator's records as to make clear the bookkeeping changes were done to defeat Wallace's claims for commissions.

The trial court believed he had failed in his attempt to show wrongful manipulation or alteration of Insealator's books and records.

A reading of the entire voluminous record fails to indicate to this Court that the trial judge was wrong in this respect. As has been stated by this Court so many times, this Court does not substitute its judgment on questions of fact in a nonjury case unless the evidence clearly preponderates in the opposite direction. Here it seems such evidence as presented fails to preponderate against the judgment of the lower court. Consequently the judgment of no cause for action in the law case must be upheld.

As to the questions involving the alleged theft of trade secrets, it would seem there are no trade secrets involved. The modifications on the extruder machine, partially developed by Wallace, seem to be far from secret. A witness, Anthony C. Fortunski, a registered professional engineer, testified that there was nothing unusual or unique about the modification on the machine or anything new or ingenious connected with it. The alleged improvements were actually known to all manufacturers and operators of extruder machines.

The use and source of supply of "spent" ginger and almond shells seem hardly to qualify as trade secrets. Both are fairly easily obtained on the open

market and the source of their supply readily apparent. Many firms were using these ingredients in stop-leak products before Wallace began using them. The formula and mixing of the ingredients should not be considered a trade secret since the various raw materials (ginger-root flour, soluble oil and almond shells) used in the manufacture of the pellets were spelled out in the Barton patent. Also, the proportions of ginger-root flour and soluble oil were also contained in the patent formula. Further, it is clear American Waterlock Corporation neither uses the same raw materials in its pellets as does Insealator nor are the proportions of the ingredients identical. American Waterlock Corporation uses no soluble oil as a binder and its pellets are coated with a film wrapper made by Mono-Sol-Corporation. Insealator employs a soluble oil binder, an "Elvanol" dip coating, and different proportions of the other raw materials than does American Waterlock Corporation.

In the case of *Dow Chemical Co.* v. *American Bromine Co.,* 210 Mich 262, Justice Brooke held that no trade secrets in a legal sense ever existed in plaintiff's plant where a suit by a corporation engaged in the manufacture of bromine and bromine compounds sought to enjoin a defendant corporation and a former employee of plaintiff from using certain processes in the manufacture of like products, claiming that defendants were using plaintiff's patents and also using trade secrets obtained by said employee while in plaintiff's employ. Justice Brooke further held that all said alleged trade secrets were made public under the patent law in the application for the patent; that there were no trade secrets involved, particularly where part of them are so simple, obvious and open to one skilled in electro-chemistry that no novelty or secrecy can be claimed

with respect to them. The court then proceeded to refuse to enjoin their use by the former employee.

It is essential to Insealator's case that it establish a disclosure in confidence to Wallace of certain trade secrets and the wrongful misappropriation of such secrets by Wallace to Insealator's damage.

As was said by Justice SMITH in *Russell* v. *Wall Wire Products Co.*, 346 Mich 581, 585, 586:

"The essence of the wrong is the breach of confidence, the betrayal of the trust placed in the recipient. As phrased in 4 Restatement, Torts, § 757, p 4:

" 'The theory that has prevailed is that the protection is afforded only by a general duty of good faith and that the liability rests upon breach of this duty; that is, breach of contract, abuse of confidence or impropriety in the method of ascertaining the secret.' "

Before there can be a betrayal of anything in the nature of a trade secret, there must be a secret. Under the testimony in the instant case, there was nothing secret about the process used by Insealator. The law does not protect knowledge so general as to be common property in the trade, and there can be no legally recognizable trade secret in an idea that is well known or is easily ascertainable.

In the *Russell Case* Justice SMITH went on to hold (p 591) that the plaintiff could not thrust upon the defendant an unwanted fiduciary status and thus deprive him, except upon levy of toll, of the freedom of action enjoyed by his competitors.

In the instant case, anyone desiring to go into the stop-leak product business could obtain a copy of the various patents and the information necessary for the manufacture and preparation of a stop-leak material and would not need to visit Insealator corporation or any other corporation to learn how to

manufacture such a product. Therefore, none of the alleged sources of supply or ingredients were in effect legal trade secrets which Wallace or the American Waterlock Corporation were prohibited from using. It is not contended that Wallace or the American Waterlock Corporation by fraudulent practices sold their product as the goods of Barton or Insealator. Wallace owed no duty to Barton relative to the acquirement of his knowledge. At no time did Wallace divert his interest in the sale of Barton's products while he was under contract with Insealator, but the record is replete with evidence that through his sales efforts the market for Insealator's products was greatly increased. After being discharged Wallace's company did not use the same process—the mixture was different in proportions, a different binder was used, a film or wrapper was used, and no "Elvanol" as a dip was used in the product now marketed by American Waterlock. No express agreement, oral or written, existed between Insealator and Wallace to keep secret the process of plaintiff Insealator, including the developments and modifications of the extruding machine. We think, therefore, that the lower court was correct in its determination that Insealator failed to substantiate its claim for damages or injunctive relief based upon an illegal use of alleged trade secrets.

The other 4 questions have to do with the admission of certain exhibits in evidence and the failure of the court to allow other exhibits in evidence, the failure to allow the use of certain depositions, and the court's alleged refusal to take certain testimony in secret.

Exhibit 9 was purported to be a document dealing with the method of operation of American Waterlock Corporation. It was never established who drafted the document, it contained no date, and it was not

established as to when it was drafted. A serious question as to its materiality might have been raised. We think the court, in the use of his discretion, properly excluded it.

Exhibits 20-A, 20-C, and 20-D, were merely self-serving declarations and were properly excluded.

Exhibit 85 was properly excluded from evidence since it was not identified as an exact model in use at the time Wallace left the employ of Insealator.

Exhibits 83-A–E were properly excluded for the same reason.

Exhibit 48 was admitted in evidence. It is contended that it was never properly identified or certified to by the patent office. While this is true, it was established that it was obtained directly from the patent office. For the purposes used, it was properly admissible.

It is contended that the discovery depositions of William P. Wallace and Douglas Raymond should have been admitted in evidence under Court Rule No 35, §6, subd (d) (2) (1945),[*] which reads as follows:

"The deposition of a party or of anyone who at the time of taking the deposition was an officer, director, or managing agent of a public or private corporation, partnership or association which is a party may be used by an adverse party for any purpose."

This section as well as others are a part of section (d), which contains the following language: "So far as admissible under the rules of evidence."

The court offered to go through the depositions and make a ruling as to the admissibility of testimony therein. Insealator insisted that they should be admitted in their entirety under this rule. The court properly ruled them out on objection to the

---

[*] Added 1952. See 334 Mich xl.—REPORTER.

effect that they contained irrelevant and immaterial testimony. Opportunity was afforded counsel to use them to contradict or impeach. This counsel apparently did not care to do. No error exists by reason of their exclusion under these circumstances.

The remaining point raised by Insealator is whether or not the trial court erred in not taking in secret in the court's chambers testimony in regard to the alleged trade secrets. The court was not asked for a ruling on this point and made none.

In view of our holding that no legal trade secrets as such were involved in this case, it would certainly appear no reason existed for invoking such a rule.

The decree dismissing Insealator's bill of complaint is affirmed.

In view of the unusual situation where both sides are appellants in this case and neither has prevailed in his position, no costs will be allowed.

DETHMERS, C. J., CARR, KELLY, SMITH, BLACK, EDWARDS, and VOELKER, JJ., concurred.