### MANOS *v.* MELTON.

1. CONTRACTS—TRADE SECRETS—EMPLOYMENT BY COMPETITOR.

Action of defendant in becoming an *employee* of competitor in plating business in which he had had an interest, sold to plaintiff pursuant to an agreement including a no-competition clause barring him from becoming a *proprietor* or *member of a firm or corporation* in a competitive business for a period of 4 years, did not violate such agreement wherein the words "employee, agent" were stricken through in the prohibitory clause.

2. SAME—TRADE SECRETS—PLATING TECHNIQUE.

Contract for sale of defendant's interest in plating business which provided he would not become a proprietor or member of a competitive business for a period of 4 years but which did not mention any secret process was not breached by defendant's disclosure to his subsequent employer of a certain plating technique known as "reverse etching."

<hr>

REFERENCES FOR POINTS IN HEADNOTES

[1] 36 Am Jur, Monopolies, Combinations, and Restraints of Trade § 74.

Relation to, or nature of contract with, competitor which amounts to violation of covenant or injunction against engaging directly or indirectly in competing business, but not expressly prohibiting acceptance of employment from competitor. 93 ALR 121.

[2] 36 Am Jur, Monopolies, Combinations, and Restraints of Trade § 67 *et seq.*

[3] 28 Am Jur, Injunctions § 72.

[4, 5] 42 Am Jur, Property § 8.

3. PROPERTY—TRADE    SECRETS—EQUITABLE    PROTECTION—COMMON
PROPERTY.

Trade secrets are entitled to equitable protection even where
the novel aspect or feature is not such as to be patentable, but
the law does not provide protection for knowledge which is
common property in the trade, or for an idea which is well-
known or easily ascertainable.

4. SAME—FACTORS IN DETERMINING TRADE SECRETS.

Factors for consideration in    determining the existence of a
trade secret are (1) amount of labor and money expended,
rather than brilliance of conception or execution, (2) em-
bodiment or capability of embodiment in a concrete form,
(3) importance of advances or differences in formulas or
process operation, (4) plaintiff's possession of the trade secret
at time defendant obtained it, (5) whether the recipient had
knowledge of it prior to its disclosure to him, (6) general
knowledge of the secret in the trade even though unknown
to recipient, and (7) maintenance of secrecy either by non-
disclosure or disclosure in confidence.

5. INJUNCTION—TRADE SECRETS—PLATING—EVIDENCE.

Evidence presented in suit to enjoin disclosure of alleged trade
secret relative to plating by way of a reverse etching process
on axle shafts *held*, insufficient to establish that plaintiff had
a legally protectible secret process, where all of the plating
processes involved were well-known in the industry, there was
no long or expensive research, and process was disclosed to
others not in confidence.

Appeal from Wayne; Gilmore (Horace W.), J.
Submitted October 13, 1959. (Docket No. 66, Cal-
endar No. 47,832.) Decided January 4, 1960.

Bill by Paul Manos and Perfection Industries,
Inc., a Michigan corporation, against Walter Melton
to enjoin disclosure of trade secrets and for damages
arising from breach of contract not to enter into
competition. Bill dismissed. Plaintiff appeals.
Affirmed.

*A. Albert Sugar* (*Meyer Weisenfeld*, of counsel), for plaintiffs.

*Ronald L. Greenberg* and *Samuel S. Greenberg*, for defendant.

EDWARDS, J. Plaintiff* in this case filed suit in equity seeking to enjoin his former associate in the plating business from disclosing to his competitors what he claimed to be secret processes, in claimed violation of the agreement whereby plaintiff acquired sole control of the business. The circuit judge, sitting in chancery, after hearing the evidence, decided that no obligation of nondisclosure of a secret process had been established, and that no violation of the agreement had been proved. He dismissed plaintiff's bill of complaint, and plaintiff appeals.

Defendant Melton had been in the hard chrome plating business for some time in a partnership. In June, 1953, plaintiff Manos and defendant formed a corporation under the name of Perfection Industries, Inc. They held or controlled equal portions of the stock.

In 1956 defendant Melton expressed a desire to get out of the business and go West to engage in ranching. As a result, on September 28, 1956, by written agreement, plaintiff bought out defendant's interest in Perfection Industries by purchasing his stock at book value. Plaintiff paid on this basis $13,000 in cash, and gave defendant a company note and mortgage for $9,400. Of this latter, some $5,400 represented the balance of the book value of defendant's stock, and $4,000 represented repayment of a loan made by defendant to the company for it

---

* The bill of complaint lists both Manos and Perfection Industries, Inc., as plaintiffs. For convenience, our references to plaintiff are to plaintiff Manos only.

to purchase stock owned by his (defendant's) mother.

The agreement made no reference to any secret processes, and there was no consideration paid to defendant above book value except as stated in section 6.

In this section, the agreement did include a no-competition clause, phrased as follows:

"6. Melton further agrees that in consideration of the purchase of his stock by Manos and in consideration of the assignment and transfer to him by the company of a 1954 Buick automobile that he will not engage in a similar or competitive business, either directly or indirectly, either as ~~employee, agent,~~ proprietor, member of a firm or corporation for a period of 4 years from this date in the State of Michigan."

It is agreed that prior to signing, the words "employee, agent" were stricken from the clause by mutual agreement.

Subsequent to the signing of the agreement, there was a claim by defendant Melton of a failure on the part of plaintiff to pay on schedule on the notes, and litigation was initiated in regard thereto by defendant, which litigation was ultimately settled.

Shortly after this event, defendant went to work for a competitor of Perfection Industries, called Precision Hard Chrome Company. Defendant's arrangement with Precision was for employment for 3 months on chrome plating work, at the rate of $1,000 a month. Defendant actually worked there for 2 months, but was paid the total sum of the $3,000 originally contemplated.

A fair construction of this record seems to us to require the conclusion that during these 3 months he showed Precision certain techniques for "reverse etching" drive shafts, with the ultimate result that Precision subsequently received allocation of such shafts from Vickers, Inc. As a result, Perfection,

which had been practically a sole supplier of such work to Vickers, received substantially less work. It is by computing profits, anticipated but not received because of this competition, that plaintiff claims damages in this suit.

Having discovered defendant's role at Precision, plaintiff Manos filed this suit for injunction and damages on the legal grounds previously stated.

We will discuss the other facts shown by the record as we deal with the questions submitted on plaintiff's appeal which we believe can be summarized thus:

Did plaintiff prove the existence of a secret process which belonged to plaintiff and to Perfection Industries, and which defendant unlawfully disclosed?

Did defendant's actions in relation to Precision Hard Chrome Company constitute violation of the stock purchase agreement?

The second of these questions, we find easiest to deal with. The contract as signed specifically deleted the prohibition on defendant becoming an employee or an agent in the plating industry. We find no testimony that persuades us, any more than it did the circuit judge, that his relationship with Precision Hard Chrome Company was such as to constitute a violation of the stock purchase agreement. There is no proof at all that defendant engaged "in a similar or competitive business, either directly or indirectly, either as proprietor, member of a firm or corporation for a period of 4 years from this date in the State of Michigan."

Further, there is no mention of secret process in the written agreement. Nor is there any testimony from which it could reasonably be implied that the agreement constituted a prohibition on defendant to refrain from demonstrating what he knew about

the "reverse etching" process. Like the circuit judge, we find no breach of the contract.

This leaves for our consideration the more difficult problem of whether or not the "reverse etching" process as developed by Manos, Melton, and Perfection Industries was a secret process which belonged to Perfection Industries.

It appears that Vickers had need of a supplier in the plating industry who could achieve a roughened surface for certain axle shafts while holding the shaft to exacting shape and size. Faced with this problem, a representative of Vickers' research and development division went to Perfection Industries in the first part of 1955 to see if Melton and Manos could suggest a solution.

After some experimentation, they did work out a process which achieved the desired results. The process involved plating the shafts, sandblasting them, and reverse etching them. The latter process appears from this record to be the removal of some of the chrome plating from the part concerned by reversal of the electrolytic process by which the chrome was deposited. The operation also involved masking and waxing portions of the shafts during these processes, and careful control of temperatures and tolerances.

Two facts about the process worked out for the Vickers' shafts appear undisputed. First, every essential component of the process, including reverse etching, was a well-known technique in the plating industry. Second, it appears that defendant Melton and Manos found a combination of well-known procedures with which they achieved a result which no other plater had achieved profitably in relation to these particular shafts.

Plaintiff Manos described the method and the discovery thus:

"*Q.* You talk about a high voltage situation. Why is high voltage not considered a normal procedure?

"*A.* In the first place, ordinary chrome is plated between 4 and 6 volts, and Walt worked in a lot of shops, and he knew more about chrome plating than I did at the time. I kept learning. And 6 volts was actually used to chrome plate on parts, and one night we developed what is called—we went up to 8 and 9 volts and it did, with the right kind of masking and the right kind of racks, air conditioned—I mean temperature control, accurate Jo blocks, we could actually make the part to the satisfaction of Vickers.

"*Q.* What was different about the masking process, if any, that you used in developing this ultimate process?

"*A.* We used a paper tape that deteriorates in the chrome tank, and by using this paper tape, with this high voltage, we could put down 4 or 5 sets of chrome very fast, the masking would stay on and it would actually produce the part at a low cost to us.

"*Q.* Was there any wax used?

"*A.* We did wax the bottom of the shaft.

"*Q.* So that there was then a combination of a high voltage that was unusual, the masking which ordinarily would deteriorate, and this wax?

"*A.* Yes.

"*Q.* What about this temperature control that you talk about?

"*A.* Well, being in the gauge business we knew that all parts had to be checked at 70 degrees, and working on a chrome tank, coming out of a chrome tank at 130 degrees, we checked the part, if we checked it at 80 degrees, 90 degrees, it would be altogether different than checking it at 70 degrees.

"*Q.* What did you and Mr. Melton develop in order to be able to check it at 70 degrees?

"*A.* We had a cooling tank with a thermometer in it and kept our temperature approximately at 70 degrees."

On cross-examination, this followed:

"*Q.* Well, what is there in the step-by-step operation that is so secret?

"*A.* The technique and the way the part is actually plated. I mean the deposit of chrome on the part to be held to a plus or minus—to a .1 round and straight tolerance, which is very—you can ask any chrome plater, it is very unusual.

"*Q.* It is not impossible, though?

"*A.* No, sir, we did it; it is not impossible.

"*Q.* You say other chrome platers haven't done it?

"*A.* Other chrome platers have tried it.

"*Q.* Haven't they done it?

"*A.* Not on this shaft here until after—

"*Q.* They can't do it on the shaft if they haven't got the shaft in their possession, but haven't they done it?

"*A.* They had the shaft in their possession, sir. Right on the stand here Precision Hard Chrome stated that they tried it. They couldn't do it profitably."

This testimony appears to be as specific as can be found in this record as a description of the claimed secret process.

There is no testimony indicating any lengthy or expensive research prior to development of the process.

Bearing on the question of whether the process described was a plater's skill or a trade secret is the course of conduct of the parties. It is undisputed that the essential ingredients, although not the exact methods, were made available to Vickers and published in its specifications for the axle shaft. It also appears that the exact methods were demonstrated by plaintiff Manos himself to another chrome plating firm in Joplin, Missouri, at request of Vickers.

We recognize that trade secrets are entitled to equitable protection even where the novel aspect or feature is not such as to be patentable. *Interna-*

*tional Industries, Inc.,* v. *Warren Petroleum Corporation* (Del), 99 F Supp 907.

See, also, 35 Am Jur, Master and Servant, § 97.

But in 2 recent cases this Court has also recognized that the law does not provide protection for knowledge which is common property in the trade, or for an idea which is well-known or easily ascertainable. *Russell* v. *Wall Wire Products Co.,* 346 Mich 581; *Insealator, Inc.,* v. *Wallace,* 357 Mich 233.

Ellis on Trade Secrets, § 239, pp 324, 325, recognizes 7 factors for consideration as to the existence of a legally protectible trade secret:

"(1) The amount of labor and money expended. Those factors rather than brilliance of conception or execution determine whether an idea or information is worthy of court protection.

"(2) The idea should be embodied or be capable of being embodied in concrete form to be protectible as a trade secret.

"(3) Trivial advances or differences in formulas or process operation are not protectible as trade secrets.

"(4) The plaintiff must prove that he was in possession of the alleged trade secret at the time defendant is alleged to have obtained it from plaintiff or one of his employees.

"(5) Where the alleged trade secret was known to the recipient prior to its disclosure to him, the recipient is free to use it.

"(6) A trade secret may not be protected if it is known generally to the trade although not known to the recipient.

"(7) Plaintiff must prove that secrecy has been maintained either by nondisclosure or disclosure in confidence."

Tested on this basis, we are clear that plaintiff failed to prove a legally protectible secret process.

The proofs before us fail to establish that the plating method described partook of sufficient new-

ness or originality to represent a secret process or trade secret. All of the plating processes employed were well-known in the industry. There was no showing of lengthy or expensive research. The fortuitous combination did not achieve even a novel result. It achieved a desired result in a profitable manner. Further, the process was disclosed to others not in confidence. From this record, we can only conclude that what defendant Melton contributed to plaintiff's competitor was his plater's skill which he had specifically reserved from the contract.

Affirmed. Costs to appellee.

Dethmers, C. J., and Carr, Kelly, Smith, Black, Voelker, and Kavanagh, JJ., concurred.