**ARCO INDUSTRIES CORPORATION,**
Plaintiff–Appellee,

v.

**CHEMCAST CORPORATION, C. J.
Edwards and Phillip L. Rubright,**
Defendants–Appellants.

No. 77–1501.

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 28, 1979.

Decided Aug. 28, 1980.

*Fig 2*   *Fig.3*

Neal A. Waldrop, Troy, Mich., for defendants–appellants.

Ernie L. Brooks, Richard P. Barnard, Reising, Ethington, Barnard, Perry & Brooks, Robert C. J. Tuttle, Southfield, Mich., for plaintiff–appellee.

Before LIVELY and ENGEL, Circuit Judges and PECK, Senior Circuit Judge.

ENGEL, Circuit Judge.

We speak in this patent infringement and unfair competition appeal of grommets. To the uninitiated, "grommet" may evoke the noise made by a frog, or perhaps a small Tolkienesque character. These particular grommets, however, are objects inserted at the points in an automobile where a wire or cable must pass through a hole in a panel, such as the shield between a car's interior and the engine area. Usually made of a resilient elastomeric material, grommets surround and seal both the cable passing through the hole and the aperture itself. The seal provided by the grommet eliminates moisture and gas leakage through the opening in the panel, while also minimizing the noise which passes through the opening. The flexible grommet also insulates the cable, protecting it against abrasion from contact with the panel.

The patent drawings depict Arco's patented grommet [1] as follows:

1. United States Patent No. 3,654,382 issued April 4, 1972.

2. United States Patent No. 3,182,119 issued May 4, 1965.

3. The experts at trial agreed that this was the improvement made by patent '382. This im-

Figure 2 illustrates the grommet with a cable inserted through the center.

Arco's patented grommet roughly resembles a round disk with a ridge around the periphery [26], two lower levels beneath the ridge [24] and [22], and a sleeved center opening, or snout [20]. The area immediately surrounding the snout is recessed, forming the thinnest part of the grommet's body [22]. The grommet also has three rigid "fingers" [12] placed at equidistant intervals around the grommet and originating at the juncture where the inner recess [22] begins. The fingers extend outward the same distance as the snout. A resilient locking "tang" [18] is on the exterior of each finger, extending from the top of the finger down toward the body of the grommet. The free end of the tang, near the body, can be deflected when the finger is inserted into a panel opening, and then released after insertion to snap into engagement with the side of the panel opposite from the body of the grommet. The tang secures the grommet to the panel, holding the body sealed to the opposite side of the panel.

Plaintiff Arco Industries pioneered the type of grommet involved in this suit with the earlier "Millard" grommet, patented in 1965.[2] In June 1970, while working as an engineer for Arco, Phillip Rubright improved upon the Millard grommet with a design which provided a positive seal between the grommet and contoured or irregular surfaces.[3] Rubright patented his

provement appears traceable to the locking tangs and the sealing ridge. The patent examiner found that these features were obvious. Nonetheless, appellant has not appealed from the district court's finding that patent '382 was not shown to be invalid. We assume for the purposes of this opinion that the patent is valid.

grommet (patent '382) and assigned the patent to Arco. The district court found that defendants had not shown the Rubright patent to be invalid,[4] and defendants do not challenge this ruling on appeal.

Phillip Rubright left Arco in March 1973 and joined co–defendant Edwards and four others to form a new automobile parts manufacturer, Chemcast Corporation.[5] Two years after its formation Chemcast began to compete with Arco in the grommet field. Arco claims that the Chemcast grommet which Phillip Rubright designed for Chevrolet infringes its patent '382. Arco further claims that the defendants wrongfully appropriated Arco's "layout" and "approach" to grommet production. The district court found that Chemcast's grommet infringed Arco's patent and that Chemcast had misappropriated Arco's trade secrets. The record made at trial compels us to reverse on both issues.

## I.

■■■ The district judge found that the accused grommets "are the structural and functional equivalents of the patented Rubright grommet, and they accomplish substantially the same result in substantially the same way . . . ." In our view, the district judge failed to take proper account of the file wrapper history of the Rubright patent. The district judge based his finding of infringement on what is known as the "doctrine of equivalents." This doctrine allows a patentee to recover for infringement when the patent does not literally read on the accused device, but the device nonetheless "performs substantially the same function in substantially the same way to obtain the same result." *Graver*

Mfg. Co. v. Linde, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed.2d 1097 (1950). However, a patentee cannot use this doctrine to broaden his claim to cover that which the Patent Examiner rejected. The prosecution history, or "file wrapper" of the patent must be consulted to determine the permissible scope of the patent. In *I.T.S. Co. v. Essex Co.*, 272 U.S. 429; 443–44, 47 S.Ct. 136, 141, 71 L.Ed.2d 335 (1926), the Supreme Court observed:

It is well settled that where an applicant for a patent to cover a new combination is compelled by the rejection of his application by the Patent Office to narrow his claim by the introduction of a new element, he cannot after the issue of the patent broaden his claim by dropping the element which he was compelled to include in order to secure his patent. . . .

The patentee is thereafter estopped to claim the benefit of his rejected claim or such a construction of his amended claim as would be equivalent thereto. *Morgan Envelope Co. v. Albany Paper Co.*, 152 U.S. 425, 429, 14 S.Ct. 627, 629, 38 L.Ed. 500. So where an applicant whose claim is rejected on reference to a prior patent, without objection or appeal, voluntarily restricts himself by an amendment of his claim to a specific structure, having thus narrowed his claim in order to obtain a patent, he "may not by construction, or by resort to the doctrine of equivalents, give to the claim the larger scope which it might have had without the amendments which amount to a disclaimer." *Weber Elec. Co. v. Freeman Elec. Co.*, 256 U.S. 668, 677, 41 S.Ct. 600, 603, 65 L.Ed. 1162.

4. In a speech presented before the Judges Seminar conducted by the Federal Judicial Center, October 16, 1974, Chief Judge Markey of the United States Court of Customs and Patent Appeals warned of the dangers of making the specific finding that a patent is "valid":

Incidentally, if I had my way, courts would never hold a patent valid! Not because of any foolish "public policy" consideration and not because it's "hypothetical" when there is no infringement. But because no one can ever be totally sure. On the other hand, to ignore the issue is unfair to litigants and to

the appellate court. Instead of finding a patent valid, I would require that the courts simply state, "the defendant in this case failed to carry his burden of proving the patent invalid." That you can be sure of. And that approach has the virtue of avoiding statistics and heartburn about "public policy."

5. The defendants–appellants are collectively referred to as "Chemcast" throughout this opinion.

This principle has become known as "file wrapper estoppel." The classic application of file wrapper estoppel occurs where a broad claim is narrowed to secure a patent. The patentee is thereafter estopped from asserting that his patent has the scope originally claimed before the narrowing amendment. While a number of this court's cases state that this estoppel only applies where infringement is based upon the doctrine of equivalents, these cases recognize that a court must also consult the file wrapper history when construing the language of a patent claim to determine whether there is literal infringement.[6] *See, e. g., Olympic Fastening Systems, Inc. v. Textron, Inc.*, 504 F.2d 609, 615 (6th Cir. 1974), *cert. denied*, 420 U.S. 1004, 95 S.Ct. 1447, 43 L.Ed.2d 762 (1975); *Kolene Corp. v. Motor City Metal Treating, Inc.*, 440 F.2d 77, 82 (6th Cir.), *cert. denied*, 404 U.S. 886, 92 S.Ct. 203, 30 L.Ed.2d 169 (1971).

The Supreme Court noted the central role of the file wrapper history in patent interpretation in the landmark patent case, *Graham v. John Deere Co.*, 383 U.S. 1, 33, 86 S.Ct. 684, 702, 15 L.Ed.2d 545 (1966):

It is, of course, well settled that an invention is construed not only in the light of the claims, but also with reference to the file wrapper or prosecution history in the Patent Office. *Hogg v. Emerson*, 11 How. 587, 13 L.Ed. 824 (1850); *Crawford v. Heysinger*, 123 U.S. 589, 8 S.Ct. 399, 31 L.Ed. 269 (1887). Claims as allowed must be read and interpreted with reference to rejected ones and to the state of the prior art; and claims that have been narrowed in order to obtain the issuance of a patent by distinguishing the prior art cannot be sustained to cover that which was previously by limitation eliminated from the patent.

Although this use of the file wrapper history is termed a rule of patent construction and not an estoppel, there is little practical difference in result.

The district court made no specific findings relating to file wrapper estoppel, although the issue was strenuously argued at trial. For the reasons which follow, we conclude that a finding of infringement in this case would impermissibly enlarge the scope of a narrowed claim to its pre—amendment state, and would constitute a revival of an abandoned claim.

Both the file wrapper history and the trial testimony indicate that when Rubright originally applied for his patent he and Arco's attorneys believed that the locking tangs constituted the improvement over the Millard grommet which would make the new grommet patentable. The first five claims of the original patent application consisted of one independent, primary claim, and four dependent claims, each incorporating the primary claim and adding

**6.** This distinction appears to stem from the Supreme Court's observation in *Graver Mfg. v. Linde*, 339 U.S. 605, 607, 70 S.Ct. 854, 855, 94 L.Ed. 1097 (1950), that: "In determining whether an accused device or composition infringes a valid patent, resort must be had in the first instance to the words of the claim. If accused matter falls clearly within the claim, infringement is made out and that is the end of it." In *Graver*, there was no literal infringement, and this phrase was an introduction to the discussion of the doctrine of equivalents. Although the *Graver* Court observed that a finding of literal infringement "ends the inquiry", the Court went on to write that:

The wholesome realism of this doctrine is not always applied in favor of a patentee but is sometimes used against him. Thus, where a device is so far changed in principle from a patented article that it performs the same or a similar function in a substantially different way, but nevertheless falls within the literal words of the claim, the doctrine of equivalents may be used to restrict the claim and defeat the patentee's action for infringement. The Court thus recognized that the literal words of a claim cannot be examined in a vacuum. The Court's language in subsequent cases, such as *Graham v. John Deere*, 383 U.S. 1, 33, 86 S.Ct. 684, 701, 15 L.Ed.2d 545 (1966), indicates that there is no distinction between the use of the file wrapper history in "literal infringement" cases and "equivalency" cases. Since the district court in this case based its finding of infringement on the doctrine of equivalents, the distinction which limits the application of file wrapper estoppel to equivalency cases does not present a problem. However, we note that in practice this distinction has little effect, for the use of the file wrapper history in construing patent claims has differed little from the application of traditional file wrapper estoppel.

one feature. Claim 1, the primary claim, described an elastomeric grommet with projecting fingers and locking tangs. The four dependent claims added the following features:

claim 2: locking tangs [18] plus sealing ridge [# 26]

claim 3: locking tangs [18] plus planar surface [# 24]

claim 4: locking tangs [18] plus recess [# 22]

claim 5: locking tangs [18] plus snout [# 20]

The Patent Examiner rejected claims 1, 2, 3 and 5 as obvious in light of the prior art, writing:

Millard shows a grommet having all of the features specified in these claims except for the resilient locking tangs stuck out from each of the fingers. . . . . .
To provide the fingers . . . of Millard with resilient locking tangs struck therefrom in the manner shown by [the] Howard [patent] . . . would be completely obvious.

The applicant accordingly cancelled claims 2, 3 and 5. The examiner allowed claim 4, if re–written in independent form. The applicant combined the rejected claim 1, the original independent claim, with claim 4 to create a new independent claim. This combined claim ultimately became claim 1 of the patent in suit, the claim which Chemcast has allegedly infringed.

■ We would violate the principle of file wrapper estoppel if we read claim 1 to cover the accused Chemcast grommet. The Patent Examiner allowed the claim only after the applicant amended it to include the recess feature. Arco's claim that the Chemcast grommet also has a "recess" insofar as the grommet surface lies below the plane of the sealing ridge misapprehends the nature of the recess in Claim 1. Although "recess" is not defined in the claim, it is a fundamental principle of patent construction that ambiguous claims are to be interpreted with reference to the patent specifications. *See, e. g. Schriber Co. v. Cleveland Trust Co.*, 311 U.S. 211, 217, 61 S.Ct. 235, 238, 85 L.Ed. 132 (1940); *United States v. Adams*, 383 U.S. 39, 48–49, 86 S.Ct. 708, 712–713, 15 L.Ed.2d 572 (1966); *Olympic Fastening Systems, Inc. v. Textron, Inc., supra*, 504 F.2d at 613; *Westwood Chemical, Inc. v. Molded Fiber Glass Body Co.*, 498 F.2d 1115, 1118–19 (6th Cir. 1974). The specifications describe the "recess" as an indentation below the planar surface of the grommet which in turn lies below the peripheral sealing ridge. The accused grommet does not have such a recess. The examiner's refusal to allow claim 1 until the recess feature was added strongly suggests that an accused device without that feature cannot infringe.

■ Our conclusion is made even more compelling by the existence of a second independent ground which would bar a finding of infringement here. A corollary to the classic file wrapper estoppel doctrine that a claim once narrowed cannot be construed to reincarnate its pre–amendment scope is the equally venerable principle that a claim cannot be construed to revive rejected or abandoned claims. *See, e. g., Graham v. John Deere Co.*, 383 U.S. 1, 33, 86 S.Ct. 684, 701, 15 L.Ed.2d 545 (1966); *Olympic Fastening Systems, Inc. v. Textron, Inc.*, 504 F.2d 609, 615 (6th Cir. 1974), *cert. denied*, 420 U.S. 1004, 95 S.Ct. 1447, 43 L.Ed.2d 762 (1975); *Kolene Corp. v. Motor City Metal Treating, Inc.*, 440 F.2d 77, 82 (6th Cir.), *cert. denied*, 404 U.S. 886, 92 S.Ct. 203, 30 L.Ed.2d 169 (1971). Writing for the court in *Olympic Fastening, supra*, Judge Lively explained that the court "consider[s] the file wrapper history as an aid to interpretation of the Claim, and specifically whether there has been an attempt to revive abandoned claims." 504 F.2d at 615.

■ With the advantage of the perspective gained on appellate review, we find that the accused Chemcast grommet is in all material respects indistinguishable from claim 2 of the original patent application. Claim 2 added the sealing ridge feature [26] to the basic grommet with elastomeric body, fingers and locking tangs described in the original claim 1. The Patent Examiner rejected this claim as obvious. The appli-

cant accordingly cancelled the claim. Since we find no material difference between rejected claim 2 and the accused grommet, a finding of infringement would necessarily revive a rejected and abandoned claim.

We note further that examination of rejected claim 2 reinforces our conclusion that there is no "recess" of the type required by the Arco patent in the accused grommet. Arco claims that the sealing ridge on the accused grommet creates a "recess" because it extends above the planar surface of the grommet. However, the Patent Examiner rejected claim 2, which necessarily contained the same "recess" between the sealing ridge and the planar surface, while at the same time allowing claim 4 which required a "recess." Obviously, the recess which the Patent Examiner considered critical constitutes something more than the difference in surface levels between the sealing ridge and the planar surface of the grommet.

■ We recognize that a finding of equivalence is a determination of fact, subject to the "clearly erroneous" standard of review. *Graver Mfg. Co. v. Linde*, 339 U.S. 605, 609–10, 70 S.Ct. 854, 856–857, 94 L.Ed.2d 1097 (1950); *Cardinal of Adrian, Inc. v. Peerless Wood Products, Inc.*, 515 F.2d 534 (6th Cir. 1975). However, in *Acme Highway Products Corp. v. D. S. Brown Co.*, 473 F.2d 849, 854 (6th Cir.), *cert. denied*, 414 U.S. 824, 94 S.Ct. 125, 38 L.Ed.2d 57 (1973), Judge Celebreeze, writing for the court, explained that "where mixed questions of law and fact are presented and there is error as to the law, we may reverse the District Court free of the clearly erroneous rule."

■ The error by the trial court in this case is not in the factual finding that the two grommets are substantially equivalent. The error is in the court's failure to apply the legal principles which restrict the permissible scope of a patent by reference to its file wrapper history. An accused device which "accomplish[es] substantially the same thing in substantially the same way" as a patented object does not invariably infringe. We must also determine

whether the file wrapper history of the patent precludes a finding of infringement, regardless of the similarity between the devices.

## II.

■ The district court found that Chemcast had misappropriated Arco's trade secrets, and enjoined Chemcast "from using the manufacturing layout shown in the photographs identified as Plaintiff's Exhibit 22 . . . and from using a colorable imitation of Arco's manufacturing layout for producing grommets, and Arco's approach to producing grommets, or any substantial duplicate of Arco's approach to producing grommets."

Plaintiff's Exhibit 22 is a series of six photographs taken at the Chemcast plant. These photographs are not entirely clear, but they primarily show molds on conveyor chains. Neither the district court's opinion nor the trial testimony further explains the meaning of Arco's "approach and layout." The constituent parts of the approach and layout are never specified. We find the injunction both vague and overly broad. While normally we would be inclined to remand for clarification of the injunction, we decline to do so here because we find that defendants did not violate Michigan's law of unfair competition.

■ Under Michigan law, two interrelated prerequisites of trade secret protection are (1) secrecy, and (2) some minimal novelty. *See Manos v. Melton*, 358 Mich. 500, 100 N.W.2d 235 (1960); *Kubik, Inc. v. Hull*, 56 Mich.App. 335, 224 N.W.2d 80 (1974). In *Kubik*, the court summarized the novelty requirement: "The term 'trade secret' does not encompass information which is readily ascertainable, i. e., capable of being acquired by competitors or the general public without undue difficulty or hardship." 224 N.W.2d at 87. In *Kewanee Oil Co. v. Bicron Corp.*, the Supreme Court similarly noted this common sense requirement for trade secret protection:

Novelty, in the patent law sense, is not required for a trade secret, *W. R. Grace &*

*Co. v. Hargadine,* 392 F.2d, at 14. "Quite clearly discovery is something less than invention." *A. O. Smith Corp. v. Petroleum Iron Works Co.,* 73 F.2d 531, 538 (CA6 1934), modified to increase scope of injunction, 74 F.2d 934 (1935). However, some novelty will be required if merely because that which does not possess novelty is usually known; secrecy, in the context of trade secrets, thus implies at least minimal novelty.

416 U.S. 470, 476, 94 S.Ct. 1879, 1883, 40 L.Ed.2d 315 (1974) (footnote omitted).

■ At trial, Arco's former president, Mr. Demrick, testified that all of the following were Arco trade secrets:

1. the design of the molds;
2. the attachment of the molds to the conveyor chain with a clip;
3. the equipment used to fill the molds;
4. the heat cycles–specifically heating molds from the bottom;
5. the removal of finished parts from the mold with forced air;
6. the silicone parting agent used to coat the molds;
7. the elastomeric material used to make the grommets.

During the course of the trial Arco introduced no credible evidence whatsoever that any of the enumerated items were in any way novel or secret. The evidence at trial clearly showed that each of the listed "secrets" was either well known in the trade, or not in fact used by Chemcast. Apparently realizing this, Arco ultimately asked the court to enjoin Chemcast's use of Arco's "layout" and "approach" to producing grommets rather than seeking an injunction directed to any of the specific practices listed above. The district court did not find that any of the enumerated items were, in fact, misappropriated trade secrets. Indeed, such a finding would not be supportable. On appeal, Arco admits that these individual steps are not protectable as trade secrets, but continues to claim a protectable layout and approach.

■ There are several flaws in Arco's argument that its layout and approach are protectable as trade secrets. Certainly it is possible that a new combination of known steps or processes can be entitled to trade secret protection. However, Arco failed to show specifically what it claimed as its protectable layout and approach. Arco never showed that the combination achieved in its overall layout and approach was in any way novel. Finally, Arco never indicated what Chemcast wrongly appropriated, other than some of Arco's business.

■ The Millard and Rubright patents illustrate Arco's general "approach" to making grommets.[7] 35 U.S.C. § 112 (1976) requires that a patent specification:

shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same . . . .

---

7. The Rubright patent refers back to the grommet construction described in the Millard patent. The Millard patent describes the basic method of construction as follows:

The grommet 20 is preferably made by foaming or casting the soft resilient material in place about the ring 24. An apparatus for making the grommet is shown in FIG. 5 and comprises a mold 30 which includes an opening 31 having a peripheral shoulder or ledge 32 against which the periphery of the ring 24 rests thereby holding the ring in spaced relationship to the bottom of the opening 31. An insert 32 in mold 31 provides the opening 33 through which the cable C extends. The ring 24 is placed in position with the fingers 26 extending upwardly and the foamed plastic is poured into the mold to fill the mold as shown in FIG. 6. The plastic is then cured in an oven or at room temperature, if it is of the room temperature curing type, and the grommet is removed from the mold.

Various resilient materials can be used. Foam rubber and foamed plastic are preferred because of their resiliency. Examples of materials which produce satisfactory results and the formulations involved are as follows:

The patent continues on to describe the formulas used, and to describe a number of variations on the basic construction method.

One purpose of this disclosure requirement is to "stimulate ideas and the eventual development of further significant advances in the art." *Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 481, 94 S.Ct. 1879, 1886, 40 L.Ed.2d 315 (1974). Because both the Millard and Rubright patents are "product" patents as opposed to "process" patents, their disclosures of the "manner and process of making" the grommet are in the public domain. Therefore, under Michigan law, this method or "approach" to producing grommets is not protectable as a trade secret. *See Insealator, Inc. v. Wallace,* 357 Mich. 233, 98 N.W.2d 643, 653 (1959).

The evidence at trial showed unequivocally that the type of conveyor, mold, injector, pump, oven and elastomeric material used by Arco, and its method of rejecting the finished grommet from the mold, were commonly known in the trade. Arco never isolated any aspect of its "layout" which is secret or in any way novel. Nothing remains of Arco's methods which can be labeled a trade secret.

Even if Arco had been able to show sufficient novelty to satisfy this prerequisite of trade secret protection under Michigan law, it could not prevail. Under Michigan law, the alleged trade secret must in fact have been treated as a secret by the plaintiff. In *Kubik v. Hull, supra,* 224 N.W.2d at 86–87, the Michigan Court of Appeals wrote: "To be a trade secret, the information must, of necessity, be a *secret:* specifically there must be evidence presented that sufficient measures have been taken to guard the secrecy of the information and preserve its confidentiality." In the same vein, the Michigan Supreme Court noted in *Glucol Mfg. Co. v. Schulist,* 239 Mich. 70, 75, 214 N.W. 152, 153 (1927), that the secrecy requirement "does not denote the mere privacy with which an ordinary business is carried on."

Undisputed testimony at trial showed that Arco had not screened off or restricted any areas in its plant and did not systematically screen visitors. Suppliers and customers were routinely shown through the plant. Management did not inform plant workers or visitors that anything in the plant was confidential. Phillip Millard, Rubright's predecessor at Arco testified that Arco's system for making grommets was neither secret nor confidential and that a visitor to the plant could observe the entire process easily. In fact, the only testimony that the layout was secret came from Arco's former president who admitted that the company took no palpable precautions, but nevertheless testified that he had considered the layout and approach to be secret. This subjective intent to treat something as secret, never acted upon by the company, is insufficient as a matter of law to warrant trade secret protection.

For the reasons stated herein we reverse the district court's ruling that defendants infringed plaintiff's patent and misappropriated plaintiff's trade secrets, and remand for modification of the district court judgment accordingly.