**ASHLAND OIL, INC., Plaintiff,**

v.

**DELTA RESINS & REFRACTORIES, INC., et al., Defendants.**

**Civ. A. Nos. 82–70966, 83–CV–0806–DT.**

United States District Court,
E.D. Michigan, S.D.

June 1, 1984.

Bruce Tittel, Cincinnati, Ohio, for plaintiff.

Donald E. Egan, Chicago, Ill., for defendants.

## OPINION

FEIKENS, Chief Judge.

Ashland Chemical Company (Ashland) brings this patent infringement action against Delta Resins & Refractories, Inc. (Delta). Ashland also asserts that Delta misappropriated its trade secrets. For reasons stated herein, I find that Ashland's patents are invalid for obviousness, and that Ashland has failed to sustain its burden of proving its trade secrets claim.

## I. BACKGROUND

This case involves patents on certain chemical products used in the foundry trade. In the foundry industry, metal castings are formed by compacting sand around a pattern, removing the pattern, and pouring molten metal into the cavity thus formed. This process often involves making cores, around which metal is poured to produce various internal configurations. A chemical binder system holds the sand in shape while the metal is poured. After the metal solidifies, the binder must break down to permit the sand to be shaken out of the casting. Examples of foundry castings include door handles and cylinder bores in automobile engines.

Before the patents in suit were issued, foundry cores were formed by curing the binders in one of five processes: oven cure, hot box, $CO_2$ silicate, no bake, and the shell process. Each type of binder process offers certain advantages and disadvantages including the speed of the cure, the core's strength and dimensional accuracy, the amount of energy required to cure .the core, its ability to be shaken out of the casting, the binder's shelf life, and the percent of core scrap.

In 1965, Ashland's predecessor hired Dr. Janis Robins to develop a binder system that would cure quickly at room tempera-ture. Dr. Robins developed a polybenzylic ether ("Pep") resin. This resin is an ingredient in Ashland's foundry binder products—Isocure and Pep Set.

The main advantage these products offer is the speed and timing of the cure. When mixed, the binder does not cure immediately; rather, the sand remains flowable for a short time (called the "work time") and can be molded around a pattern. The amount of work time can be changed by varying the amount of catalyst in the binder. Then the binder cures very quickly, and the core thus formed is essentially ready to use. Graphically, when plotting time against compressive strength, these binders produce a sharper "S" curve than other binders. The "S" curve illustrates that the binder begins to cure slowly, approaches its maximum strength in a short period of time, and then gains very little additional strength as more time elapses. These curing characteristics increase foundry productivity.

### A. The Patents

Ashland owns the three disputed U.S. Patents issued to Dr. Robins: 3,485,797 (797); 3,409,579 (579); and 3,676,392 (392). Ashland accuses Delta of infringing claims 1, 2, 7 and 10 of 797; claims 14 and 19 of 579; and claim 17 of 392. The phenolic resin patented under 797 is a component of the foundry sand binders patented under 579 and 392.

The 797 patent (entitled "Phenolic Resins Containing Benzylic Ether Linkages And Unsubstituted Para Positions"), issued in 1969, claims a phenol formaldehyde resin. Claim 1 claims a process for reacting phenol with formaldehyde, where the ratio of formaldehyde to phenol is greater than one. The claim specifies the reaction to be 1) under substantially anhydrous conditions, 2) at a temperature between 100°C and 130°C and 3) in the presence of catalytic concentrations of soluble divalent metal salt. Claim 2 claims "[t]he process of claim 1 wherein the reaction temperature is from about 110–120°C." Claim 7 claims the process of claim 1 "wherein the divalent metal

salt is a salt of lead or zinc." Finally, claim 10 illustrates the chemical structure of the claimed resin with a drawing of three phenolic rings linked together with ether and methylene bridges. These molecules, together with 1 and 2 ring molecules called adducts, form the resin component of the binder systems patented under 392 and 579.

The 579 patent (entitled "Foundry Binder Compositions Comprising Benzylic Ether Resin, Polyisocyanate, and Tertiary Amine"), issued in 1968, discloses a gas cured binder system comprised of a phenolic resin, a polyisocyanate (as a hardener) and tertiary amine (as a curing agent). Claim 14 claims "[a] foundry mix containing sand as the major constituent and a binding amount of up to 10% based on the weight of sand of the binder of claim 6." Claim 6 claims the three-part binder system where the phenolic resin is that claimed in claim 10 of the 797 patent. Claim 19 claims a process for preparing shaped foundry products wherein the resin component of the binder is the phenolic resin of claim 10 of the 797 patent.[1] Ashland asserts that its product Isocure is patented under 579, and that Delta's Delta Kure infringes this patent.

Finally, the 392 patent (entitled "Resin Compositions") was issued in 1972, and claims a resin comprised of a phenolic resin, a polyisocyanate and a liquid curing agent with $pK_b$[2] value in the range of about 7 to about 11. Claim 17 of 392 claims "[a] foundry mix containing sand as the major constituent and a binding amount of up to 10 percent based on the weight of sand of the resin composition of claim 7."

Claim 7 claims through claim 1, the three-part binder system where the resin component is the resin claimed in claim 10 of the 797 patent. Ashland asserts that its product Pep Set is patented under 392, and that Delta's Delta Set infringes.

### B. The Milwaukee Litigation

Ashland and Delta are not strangers. They met in the United States District Court for the Eastern District of Wisconsin, where Judge Terence Evans found various claims of the 579 and 392 patents invalid for obviousness. *Ashland Oil, Inc. v. Delta Oil Products,* 212 U.S.P.Q. 508 (E.D.Wis.1981), *revd. in part,* 685 F.2d 175 (7th Cir.1982), *cert. denied,* 460 U.S. 1081, 103 S.Ct. 1769, 76 L.Ed.2d 343 (1983). The United States Court of Appeals for the Seventh Circuit reversed the decision insofar as it invalidated all 17 claims of 392 for double patenting when only two of those claims were actually litigated before the District Court. In all other respects, the Evans' opinion was affirmed. The claims before Judge Evans were similar though not identical to the foundry binder claims in suit here.

Judge Evans invalidated for obviousness claims 1, 13, 15, 16 and 18 of the 579 patent.[3] Claim 13 contains the same three-part foundry binder system claimed in claim 14 (in issue here) except the phenolic resin component differs. Claim 14 uses the "Pep" resin of the 797 patent (not in suit in Milwaukee) instead of a resole or novolac resin referred to in claim 13. Similarly, the only difference between claim 15 and claim 19 (in issue here) is that the latter uses the

---

1. Claim 19 is dependent on claim 15, which claims:

    The process of preparing shaped foundry products which comprises:
    (a) forming a foundry mix by uniformly distributing on a foundry aggregate containing sand as the major constituent a binding amount of up to 10% based on the weight of the aggregate of a binder composition obtained by combining the phenolic resin component and hardener component of claim 1, said polyisocyanate being employed in a concentration of 10 to 500% by weight of the phenolic resin;

    (b) shaping the foundry mix in a mold; and
    (c) contacting the shaped foundry mix with a tertiary amine until the binder has cured.

2. The $pK_b$ value measures basicity.

3. The prior art which Judge Evans relied on included the Saunders & Frisch treatise Polyurethanes—Chemistry and Technology, U.S. Patent 3,242,107 to Bunge, U.S. Patent 3,034,794 to Feiler, U.S. Patents 3,409,571 and 3,398,122 to Shepard, U.S. Patent 3,282,896 to Einberg, and British Patent 1,031,909 to General Electric.

"Pep" resin and the former uses conventional resole resins.

Judge Evans also invalidated for obviousness claims 1 and 16 of the 392 patent.[4] Claim 16 contains the same foundry mix claimed in claim 17 (in issue here) except the latter uses the "Pep" resin while the former uses conventional phenolic resins. In sum, the difference between the claims litigated in Milwaukee and the foundry binder claims in dispute here is that the former involve conventional phenolic resins and the latter involve the "Pep" resin.

## II. DISCUSSION

■ There are three independent legal requisites to a valid patent: utility, novelty and nonobviousness. *Armco, Inc. v. Republic Steel Corp.*, 707 F.2d 886, 889 (6th Cir.1983); *General Motors Corp. v. Toyota Motor Corp.*, 667 F.2d 504, 505 (6th Cir. 1981), *cert. denied* 456 U.S. 937, 102 S.Ct. 1994, 72 L.Ed.2d 457 (1982); *American Seating Co. v. National Seating Co.*, 586 F.2d 611, 615 (6th Cir.1978), *cert. denied*, 441 U.S. 907, 99 S.Ct. 1999, 60 L.Ed.2d 377 (1979). The nonobviousness requirement is codified in 35 U.S.C. § 103 (1982):

> A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

The United States Supreme Court interpreted this language in *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). The Court noted that although the ultimate question of patent validity is a legal one, *A. & P. Tea Co. v. Supermarket Corp.*, 340 U.S. 147, 155, 71 S.Ct. 127, 131, 95 L.Ed. 162 (1950), the determination of obviousness or nonobvi-

ousness lends itself to several basic factual inquiries:

> Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent are resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy.

*Graham*, 383 U.S. at 17, 86 S.Ct. at 694. The United States Courts of Appeals, including the new Federal Circuit, uniformly follow this test. *Environmental Designs v. Union Oil Co. of California*, 713 F.2d 693, 695 (Fed.Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984); *Shemitz v. Deere & Co.*, 623 F.2d 1180, 1184 (7th Cir.), *cert. denied*, 449 U.S. 921, 101 S.Ct. 320, 66 L.Ed.2d 149 (1980); *Eltra Corp. v. Basic Inc.*, 599 F.2d 745, 751 (6th Cir.), *cert. denied*, 444 U.S. 942, 100 S.Ct. 297, 62 L.Ed.2d 308 (1979); *Steelcase, Inc. v. Delwood Furniture Co.*, 578 F.2d 74, 78 (5th Cir.1978), *cert. denied*, 440 U.S. 960, 99 S.Ct. 1503, 59 L.Ed.2d 774 (1979); *Clark Equipment Co. v. Keller*, 570 F.2d 778 (8th Cir.), *cert. denied*, 439 U.S. 825, 99 S.Ct. 96, 58 L.Ed.2d 118 (1978).

■ Delta, as the party asserting patent invalidity, bears the burden of proving that the claims in issue are obvious in light of the prior art. Recent Federal Circuit decisions establish that facts relied on by a patent challenger to prove obviousness must be established by clear and convincing evidence, *Railroad Dynamics, Inc. v. A. Stucki Co.*, 727 F.2d 1506 (Fed.Cir.1984); *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1359–60 (Fed.Cir.

---

**4.** The prior art which Judge Evans relied on primarily included the Saunders & Frisch treatise, U.S. Patent 2,906,717 to Sekmakas, U.S. Patent 3,156,659 to Robitschek, U.S. Patent 3,063,964 to Khawam, as well as the Feiler, Bunge and Shepard patents. *See* note 3, *supra*.

1984); *Connell v. Sears, Roebuck & Co.,* 722 F.2d 1542, 1549 (Fed.Cir.1983), although there is an earlier body of law to the contrary, *see, e.g., Eltra, supra* at 750; *Dickstein v. Seventy Corp.,* 522 F.2d 1294, 1297 (6th Cir.1975), *cert. denied,* 423 U.S. 1055, 96 S.Ct. 787, 46 L.Ed.2d 644 (1976). Once Delta establishes a prima facie case of obviousness, the burden of going forward shifts to Ashland, as owner of the patents, to rebut with evidence of nonobviousness. *In re Nalbandian,* 661 F.2d 1214, 1218 (C.C.P.A.1981); *Application of Fielder,* 471 F.2d 640, 642–43 (C.C.P.A. 1973). The burden of persuasion, however, remains with Delta as the party asserting invalidity. *See Astra-Sjuco, A.B. v. United States International Trade Commn.,* 629 F.2d 682, 688, 67 C.C.P.A. 128, (1980); *Solder Removal Co. v. United States International Trade Commn.,* 582 F.2d 628, 632–33, 65 C.C.P.A. 120 (1978).

■ Accordingly, to determine whether Delta has met its burden of proving that the Robins patents are invalid for obviousness,[5] I must: 1) determine the level of ordinary skill in the art, 2) examine the prior art references and the differences between those references and the Robins patents and 3) look at secondary considerations as indicia of obviousness or nonobviousness.

### A. *The Level of Ordinary Skill*

■ In determining obviousness under § 103, "it is important to remember that the criterion is measured not in terms of what would be obvious to a layman, but rather what would be obvious to one 'reasonably skilled in [the applicable] art.'". *Dann v. Johnston,* 425 U.S. 219, 229, 96 S.Ct. 1393, 1398, 47 L.Ed.2d 692 (1976) (cite omitted). For the patents involved here, I find that a person of ordinary skill would have a bachelor's degree in chemistry, sev-

eral years experience in phenolic and urethane chemistry, and several months exposure to the foundry art. This finding agrees with Judge Evans' holding that "a person with a bachelor's degree in chemistry plus two years of research experience in phenolic and polyurethane chemistry, preferably with additional work with foundry binders would appear to have 'ordinary skill in the art.'" *Ashland,* 212 U.S.P.Q. at 508.

### B. *797 Prior Art*

### 1. *The Resin Claim*

Claim 10 illustrates the chemical structure of the claimed resin:

10. The phenol formaldehyde resin having the general formula

wherein R is hydrogen, hydrocarbon radical, oxyhydrocarbon radical or halogen, meta to the hydroxyl group of the phenol; m and n are numbers the sum of which is at least two and the ratio of m-to-n is greater than one; and A is a hydrogen or a methylol group, the molar ratio of said methylol group to hydrogen being at least one.

The diagram shows three phenol rings linked together by an ether bridge ($CH_2$–O–$CH_2$) and a methylene bridge ($CH_2$). The algebraic brackets with the subscripts m and n indicate that these units may repeat, and the molecule may have considerably more than three rings. The patent requires the sum of m and n to be at least two; therefore, the molecule must have at least three rings, and may have up to 40 rings. The entire resin contains some

---

5. Delta also argues that even if the patents in suit are nonobvious and valid, neither their products nor Ashland's products are covered by these patents. Delta argues that the patent claims involved here require an average of 3 or more rings per molecule in the entire resin, and that both Delta and Ashland's products contain an average of approximately 2.5 rings per molecule. Ashland argues that the patented resin contains both some claim 10 material as well as one and two ring adducts, and that the patents only require the claim 10 material, not the entire resin to have an average of three or more rings. Since I find that the patents in suit are invalid for obviousness under § 103, I need not reach the question whether the patents in suit cover Ashland's products, and if so whether Delta's products infringe.

three ring and greater molecules, along with a substantial amount of one and two ring molecules called adducts. The bridges connect the phenol rings at the ortho positions (two and ten o'clock positions), and the para position (six o'clock position) is unsubstituted, or open. Ashland asserts that the open para position produces a polyurethane which is superior for foundry use, and the ortho ortho orientation is much more reactive toward isocyanates than non-ortho ortho resins.

Delta relies primarily on three pieces of prior art to support its argument that claim 10 is obvious. First, it argues that the process described in U.S. Patent 2,079,633 issued to Rothrock in 1935 produces claim 10 material. Rothrock's procedure produces a small amount of 3 ring and greater molecules along with a large proportion of adducts. Although Rothrock did not have the technology to identify the ether and methylene bridges, the process he describes nonetheless produces claim 10 material. Ashland, on the other hand, denies that the Rothrock process produces the Robins resin. It argues that the Rothrock resin is inferior to the claim 10 material as a foundry binder because Rothrock's hydroxyl groups are modified by butyl alcohol.

Second, Delta cites Megson, Phenolic Resin Chemistry (1958) as prior art. Megson discusses cross-linking phenolic resins and, Delta argues, diagram A (p. 29) illustrates a polybenzylic ether resin within the scope of claim 10. The drawing shows phenol-formaldehyde resin molecules in an ortho ortho orientation, connected by ether bridges, and an open para position. Although this diagram shows no methylene bridges, this molecule is still within the scope of claim 10. That claim requires the sum of methylene bridges and ether bridges to be at least two, and the Megson structure satisfies that requirement with its two ether bridges. Ashland, on the other hand, argues that this molecule is only a possibility of what occurs during curing, not what is present in a room temperature reaction product. The thrust of Ashland's argument is that Megson offers no clear instructions on how to prepare this hypothetical structure.

Finally, Delta relies on Martin, The Chemistry Of Phenolic Resins (1956). Martin illustrates a linear polymeric ether resin which contains phenol rings linked together by ether bridges in an ortho ortho orientation. The diagram indicates that the polymer can consist of up to 35 units held together with ether links. Jordon Kopac, president of Delta, testified that Martin explains how ether links are formed, and how to increase the amount of these linkages. As temperature increases, some ether linkages will break down, which produces methylene linkages and formaldehyde. This formaldehyde is then available to cross-link the resin (tr. 772–85). Ashland argues that Martin differs from Robins in that the Martin structure is para substituted while claim 10 is para unsubstituted. The open para position allows the phenol ring to react at that site, which is important in producing a superior binder.

Based on this prior art, I find that Delta has sustained its burden of proving by clear and convincing evidence that claim 10 of the 797 patent is obvious to one of ordinary skill in the art. While no single piece of prior art renders claim 10 obvious, all the references taken together suggest the material claimed in claim 10. *See Leinoff v. Louis Milona & Sons, Inc.*, 726 F.2d 734, 739 (Fed.Cir.1984) ("The question of obviousness depends, furthermore, on 'not only what the references expressly teach, but what they would collectively suggest to one of ordinary skill in the art.'" (cite omitted)); *In re Sernaker*, 702 F.2d 989, 994 (Fed.Cir.1983) (obviousness will be found where "a combination of the teachings of all or any of the references would have suggested (expressly or by implication) the possibility of achieving further improvement by combining such teachings along the line of the invention in suit ..."). A person of ordinary skill in the art, examing the Rothrock, Martin and Megson references, would see a phenol formaldehyde resin containing linear polymers consisting of phenol rings. These phenol rings are connected together by ether bridges or

ether and methylene bridges in an ortho ortho orientation. Finally, the prior art, specifically Megson, discloses phenol rings with an open para-position. These references collectively suggest the critical elements of the claimed resin.

Ashland's evidence as to the differences between the prior art and claim 10 is insufficient to rebut Delta's prima facie showing of obviousness. Although differences exist between claim 10 and the prior art, Ashland failed to establish that one of ordinary skill in the art would be unable to read the prior art references and "discover" the resin claimed by Robins. Dr. Conley, President of the Union for Experimenting Colleges and Universities, testified for Ashland that in his opinion, the prior art does not render the Robins resin obvious to one of ordinary skill. Dr. Conley also testified that the Robins resin was not obvious to him, even though he is an expert in phenolic chemistry (tr. 980–81). Yet this testimony does not attack the relevancy of Delta's prior art proof. While the prior art is not identical to claim 10, I hold that Ashland has failed to rebut Delta's clear and convincing evidence that claim 10 is obvious to one of ordinary skill in light of the prior art.

### 2. The Process Claims

Claim 1 claims a process for reacting phenol and formaldehyde where 1) the ratio of formaldehyde to phenol is greater than 1, 2) the reaction occurs under substantially anhydrous conditions, 3) the temperature range is between 100°C and 130°C and 4) the catalyst is a soluble divalent salt. Claim 2 claims the same process but specifies a temperature range of 110–120°C. Claim 7 claims the same process but specifies the divalent metal salt to be lead or zinc. Following this procedure produces the polymeric material illustrated in claim 10.

Delta has sustained its burden of proving by clear and convincing evidence that the prior art discloses reacting phenol with formaldehyde under essentially the same conditions as the Robins patent. The Rothrock patent, *supra*, describes a process for manufacturing phenol-formaldehyde resins.

This patent illustrates a process using: 1) a ratio of formaldehyde to phenol greater than 1, 2) paraformaldehyde (the anhydrous form of formaldehyde) and removal of water in some cases, 3) a temperature range of 100–120°C and 4) soluble metal salts, including zinc acetate.

Japanese Patent 13696/60 relates to a process for producing phenol formaldehyde initial condensates. This process reacts phenol and formaldehyde: 1) under anhydrous polymerization conditions (starting with paraformaldehyde and removing water), 2) at temperatures above 100°C and as high as 120°C and 3) using soluble metal salts as catalysts. Although the examples illustrate a formaldehyde to phenol ratio of less than 1, the patent states that a ratio of greater than 1 may be used.

The Fraser, Hall and Raum work, *Preparation of 'High-Ortho' Novolak Resins*, appearing in the Journal of Applied Chemistry in 1957, is also cited as prior art. This paper discusses the effectiveness of zinc and lead as catalysts to form ortho ortho linked phenol-formaldehyde chains, and when reacted at temperatures below 140°C, benzylic ether bridges are formed.

There are differences, as Ashland points out, between claims 1, 2 and 7 and the cited prior art. Unlike Robins, Rothrock does not teach removal of water at temperatures above 100°C and Fraser does not teach removal of water at all. Both Rothrock and the Japanese Patent use butyl alcohol as a solvent, whereas Robins teaches the use of toluene. Further, the butyl alcohol modified resin produced by Rothrock is not a phenolic resin. Ashland also argues that neither the Japanese Patent nor Fraser produce compounds with greater than two rings.

Ashland, however, has failed to establish that these differences, in light of Delta's proof, are great enough to render the Robins patent nonobvious. The cited references collectively, if not individually, teach the critical features of Robins: 1) formaldehyde-phenol ratio greater than 1, 2) anhydrous conditions, 3) temperature range of 100°C to 120°C and 4) soluble metal salt

catalysts. The claims themselves do not mention the use of solvents or removal of water. Further, the differences between the prior art and claims 1, 2 and 7 are insignificant because one of ordinary skill in the art could study the prior art references and come upon the Robins process claims. For example, one of ordinary skill could read Rothrock and recognize that varying the solvent in example 5 and removing water (as Rothrock did in examples 1 and 7) yields a process for preparing certain phenol-aldehyde reaction products. This process could be substantially similar to Robins. Similarly, although the Japanese Patent and Fraser paper do not produce compounds with greater than two rings, one of ordinary skill reading these pieces of prior art could apply his knowledge and develop a process for preparing a phenolic resin which could be substantially similar to Robins. In short, I find that the prior art cited by Delta would suggest to one of ordinary skill in the mid 1960's the possibility of developing the processes claimed in claims 1, 2 and 7 of the 797 patent.

## C. *Foundry Binder Claims: 579 and 392 Prior Art*

Claim 14 of 579 and claim 17 of 392 claim foundry mixes made from phenolic urethanes. Claim 19 of 579 claims a process of preparing foundry shapes using the mix claimed in claim 14. The foundry binder systems consist of the Robins "Pep" resin, polyisocyanate, and a tertiary amine catalyst (for 579) or a catalyst with a $pK_b$ value of about 7 to about 11 (for 392). The only difference between these 3 patent claims and those invalidated by Judge Evans is that the former use the Robins "Pep" resin

while the latter use novolac or resole resins.[6]

### 1. *Phenolic Urethane Foundry Binders*

Delta argues that the prior art discloses the use of phenolic urethanes as foundry binders. It relies primarily on U.S. Patents 3,409,571 and 3,398,122 issued to Shepard, *et al.* in 1968, and British Patent 1,031,909 to support its assertion of obviousness.

Dr. Frisch, a professor of polymer chemistry and the Director of the Polymer Institute of the University of Detroit, testified that a person of ordinary skill would not have found the foundry binder claims obvious. He testified that it was known in the field that reacting phenol with isocyanates results in a blocked phenol forming an unstable urethane. This material disassociates or reverses to phenol and isocyanates upon heating at temperatures of 140°C to 150°C. Therefore, one of ordinary skill in the art would not expect polyurethanes to work as foundry binders. An examination of the prior art, however, leads me to a contrary conclusion.

The British patent was published on June 2, 1966, and was based on an application filed in Great Britain in 1963. This application was based on one filed in the United States in 1962. Though technically not prior art, this patent indicates what was known to persons of ordinary skill in the foundry art. The patent describes reacting novolac resins with highly reactive divalent materials to make a soluble product which can then be thermoset to produce a foundry binder. Claim 12 specifically claims "binders for sand." Based on my reading of the patent, I conclude that the British

---

**6.** Although the same patents that were involved in the Milwaukee case are present here, I am not collaterally estopped from deciding whether the claims before me are invalid for obviousness. The binders involved in the Milwaukee case contained a different resin component, and therefore, this case does not "present questions of fact identical to the questions presented in the [Milwaukee trial]." *Westwood Chemical Inc., v. Molded Fiber Glass Body Co.*, 498 F.2d 1115, 1117 (6th Cir.1974). *See also Plastic Container Corp. v. Continental Plastics, Inc.*, 607

F.2d 885 (10th Cir.1979). Delta argues that I am bound by several factual findings that Judge Evans made concerning the scope and content of the prior art. I need not consider this point because upon independent examination of the prior art, I reach the same conclusions that Judge Evans did. Delta also argues that I am bound by Judge Evans' finding concerning infringement. I need not address this point in that I base my holding on the patents' invalidity and do not reach the question of infringement.

Patent discloses the use of phenolic urethanes as foundry binders. In examining the prior art in the Milwaukee litigation, Judge Evans also concluded that "the British Patent [describes] polyurethanes as thermoset compositions and specifically claims them as binders for sand...." 212 U.S.P.Q. at 517.

More significant are the 571 and 122 patents issued to Shepard *et al.* Shepard describes a novolac phenolic resin modified with a phosphorous compound. This material is a soluble thermoplastic. The 571 patent clearly states that thermosetting products can be produced by mixing thermoplastic products with polyisocyanates. Such thermosetting products are "useful ... as foundry sand binders." (571, Col. 7). Shepard goes on to say that the polyurethane products can be used as foamed products, castings, coatings and the like. Based on the foregoing, I find that Delta has sustained its burden of proving that one of ordinary skill in the art could read the Shepard patents, especially in combination with the British Patent, and conclude that phenolic urethanes are taught as foundry binders. Here too, Judge Evans and I agree. ("The Shepard '571 patent ... describes phenolic urethanes as thermoset materials that can be used as foundry binders." 212 U.S.P.Q. at 518.)

Ashland argues that even if Shepard teaches the use of phenolic urethanes as foundry sand binders, the Robins foundry binders are not obvious in light of Shepard's patents due to the differences between the two. Specifically, Shepard uses a novolac resin while Robins uses the "Pep" resin. This difference, however, is insufficient to warrant a finding of nonobviousness. Just as one "skilled in the art of phenolic resins could readily sense that a resole resin might be substituted for a novolac" in Shepard, *Ashland v. Delta*, 212 U.S.P.Q. at 519, he could also readily sense that the "Pep" resin might be substituted into the Shepard patent. It was known in the prior art how ether bridges and OH groups react with polyisocyanates. Accordingly, one of ordinary skill could look at Megson, Martin and Rothrock, analyze their teachings in light of Shepard and the

British Patent, and conclude that a polybenzylic ether resin could be plugged into Shepard to produce a phenolic urethane foundry binder. The improvement achieved by this substitution "is that of the skillful mechanic, not that of the inventor." *Hotchkiss v. Greenwood*, 52 U.S. (11 How.) 248, 267, 13 L.Ed. 683 (1851).

### 2. *Catalysts*

#### a. 579 Catalyst: Tertiary Amines

The 579 patent (specifically claims 14 and 19 by reference) disclose the use of a tertiary amine as a catalyst to promote the reaction between the "Pep" resin and the polyisocyanate. Delta argues that the prior art discloses that tertiary amines accelerate the reaction between phenolic resins and polyisocyanates. Saunders & Frisch, Polyurethanes: Chemistry And Technology (1962, reprinted in 1978) states that at slow temperatures "one normally uses a catalyst such as a tertiary amine or aluminum chloride to promote this reaction." Further, the Shepard patents, *supra,* U.S. Patent 3,242,107 issued to Bunge *et al.* in 1966, U.S. Patent 3,282,896 issued to Einberg in 1966, and U.S. Patent 3,043,794 issued to Feiler *et al.* in 1962, disclose that tertiary amines in lieu of or in addition to heat promote the reaction between phenolic resins and polyisocyanates. *See also Ashland v. Delta*, 212 U.S.P.Q. at 517. Based on these patents and the Saunders & Frisch work, I find that Delta has sustained its burden of proving that one of ordinary skill in the art of phenolic chemistry would find it obvious to use tertiary amines to promote the reaction between the "Pep" resin and polyisocyanates.

#### b. 392 Catalyst: $pK_b$ Range

The 392 patent (specifically claim 17 through claim 7 and in turn through claim 1) discloses the use of a curing agent "having a $pK_b$ value in the range of about 7 to about 11." Delta argues that the prior art discloses the use of such catalysts to promote the reaction between phenolic resins and polyisocyanates. Saunders & Frisch, *supra* at 138–39, refer to work done in the

1940's which showed that base strength is a controlling factor of a catalyst's effectiveness in urethane formation. This work involved catalysts in the $pK_b$ range specified by Robins. Moreover, the Shepard patents, *supra*, U.S. Patent 3,156,659 issued to Robitschek in 1964, U.S. Patent 3,063,964 issued to Khawam in 1962, and U.S. Patent 2,906,717 issued to Sekmakas in 1955 disclose the use of various catalysts with a $pK_b$ value in the range selected by Robins to promote the reaction between phenolic resins and polyisocyanates. Based on this prior art, I find that Delta has sustained its burden of proving that the use of a curing agent with a $pK_b$ value of about 7 to about 11 to promote the reaction between the "Pep" resin and polyisocyanates would be obvious to one of ordinary skill. *See also Ashland v. Delta*, 212 U.S.P.Q. at 518–19.

### D. *Secondary Considerations*

█ The Supreme Court suggests that secondary considerations such as commercial success, long felt but unsolved needs, failure of others, etc., may have relevancy as indicia of obviousness. *Graham v. John Deere Co.*, 383 U.S. at 17, 86 S.Ct. at 693. Recent Federal Circuit cases emphasize that "[a]ll evidence bearing on the issue of obviousness ... must be considered and evaluated *before* the required legal conclusion is reached." *Gore and Associates v. Garlock, Inc.*, 721 F.2d 1540, 1555 (Fed.Cir.1983), *Stratoflex Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538 (Fed.Cir. 1983) ("Thus evidence rising out of the so-called 'secondary considerations' must always when present be considered en route to a determination of obviousness."). Accordingly, I have considered relevant secondary considerations before reaching the conclusion that the Robins patents are obvious.

The 797 patent discloses the phenolic resin and processes for producing that resin. There are no independent secondary considerations relevant to the 797 patent apart from its use in Isocure (patented under 579) and Pep Set (patented under 392). Ashland has sold millions of pounds annually of these products, both of which enjoy an increasing market share. Ashland has granted licenses under these patents to Combustion Engineering Company (C.E. Cast) and International Minerals and Chemical Company (IMC).

After Ashland lost the Milwaukee litigation, C.E. Cast sought a declaratory judgment that the patents here in suit were invalid. The license was subsequently renegotiated reducing the royalty from 12½% to 5%. About 1 year after Ashland granted the license to IMC, it went out of business.

Ashland offered proof that Isocure and Pep Set have received recognition from the foundry industry in the form of awards and write-ups in trade publications. This recognition, however, has been directed more towards the marketing of rather than invention of these products. Significantly, Dr. Robins has received no recognition from the industry and only $200.00 from Ashland for his role in developing Isocure and Pep Set.

█ While the secondary considerations, especially the commercial success of Isocure and Pep Set are impressive, I can only weigh these criteria as evidence of obviousness. The law is well established that commercial success alone, or combined with other secondary evidence is insufficient to establish patentability where primary indicia of obviousness is lacking. *Sakraida v. Ag Pro, Inc.*, 425 U.S. 273, 283, 96 S.Ct. 1532, 1538, 47 L.Ed.2d 784 (1976) ("[P]roducing a desired result in a cheaper and faster way, and enjoying commercial success 'without invention will not make patentability.'" (citation omitted); *Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp.*, 340 U.S. 147, 153, 71 S.Ct. 127, 130, 95 L.Ed. 162 (1950) ("But commercial success without invention will not make patentability."); *Eltra Corp. v. Basic, Inc.*, 599 F.2d 745, 756 (6th Cir.1979) ("Of course, commercial success and satisfaction of long-felt needs are alone not sufficient to establish that the product is the result of invention.") In weighing Isocure and Pep Set's secondary considerations including commercial success against

the primary indicia of obviousness (disclosures in the prior art), I nonetheless conclude that all the patent claims in suit are invalid for obviousness.

### E.  Trade Secrets

Finally, Ashland argues that Delta misappropriated its trade secrets relating to the manufacture of the "Pep" resin. There are three parts to this claim. Delta's first alleged misappropriation arises out of its purchase from IMC of its Detroit facility. IMC had a license agreement with Ashland, and because Ashland refused to permit IMC to transfer its technology to Delta, the IMC-Delta purchase agreement required IMC to remove all Ashland technology from the plant before Delta took over. When Delta took over the Detroit plant, it hired IMC's plant manager, who, without Delta's knowledge, kept copies of certain Ashland procedures. Ashland charges that the plant manager shared this technology with Delta's research chemist who produced four batches of resin with this procedure. Delta subsequently fired both the plant manager and research chemist. Second, Ashland charges Delta with misappropriating its refractive index end-point. The refractive index is a means of measuring how far a phenol-formaldehyde reaction has progressed. Ashland is not claiming that use of the refractive index itself is a trade secret; rather, it argues that it has a proprietary interest in the particular end-point at which it completes its cook. Third, Ashland claims that Delta misappropriated its trade secrets regarding the use of Aromatic Solvent 7545.

■ ■  A trade secret may "consist of any formula, process, pattern, device or compilation of information that is used in one's business and which gives him an opportunity to gain an advantage over competitors who do not use it." *Allis-Chalmers Manufacturing Co. v. Continental Aviation and Engineering Corp.*, 255 F.Supp. 645, 653 (E.D.Mich.1966). A trade secret will be afforded legal protection where 1) the claimed secret is not a matter of general or public knowledge, 2) the secret provides the holder with a business advantage, and 3) the holder has taken reasonable steps to protect the secret. *See Allis-Chalmers*, 255 F.Supp. at 653; *Insealator Inc. v. Wallace*, 357 Mich. 233, 248, 98 N.W.2d 643 (1959). The thrust of a trade secrets claim is the betrayal of a trust, breach of a confidence, or impropriety in the method of ascertaining the secret. *See Insealator*, 357 Mich. at 250, 98 N.W.2d 643; *Russell v. Wall Wire Products Co.*, 346 Mich. 581, 585–586, 78 N.W.2d 149 (1956); Restatement, Torts § 757.

I find that Ashland has failed to establish by a preponderance of the evidence that Delta misappropriated its trade secrets. There was insufficient proof offered at trial to show that it was more likely than not that Delta used Ashland's procedures for manufacturing the "Pep" resin. Moreover, Ashland was unable to prove that it took reasonable steps to protect its claimed secrets and that Delta acted improperly in obtaining the disputed information.

Similarly, Ashland failed to prove that Delta's use of the refractive index was improper. The use of a refractive index to determine the end point in the production of phenolic resins is a matter of public knowledge. For example, Georgia Pacific and American Marietta used a refractive index to control manufacture of phenolics. Not only did Ashland fail to prove that its particular end-point is a trade secret, but U.S. Patent 4,311,619 issued to Seeney in 1982 discloses the use of an end-point in the production of a phenolformaldehyde resin in the range selected by Ashland.

Finally, Ashland failed to produce any evidence from which I could conclude that Aromatic Solvent 7545 was a trade secret, and that Delta misappropriated it.

### III.  CONCLUSION

■  Delta has sustained its burden of proving by clear and convincing evidence that all of the patent claims in suit would have been obvious to one of ordinary skill in the art in light of the cited prior art. Consideration of the secondary indicia of obviousness does not alter my conclusion. I also find that Ashland has failed to sup-

port its allegations that Delta misappropriated Ashland's trade secrets.

An appropriate order may be presented.