### AEROSPACE AMERICA, INC.

v.

### ABATEMENT TECHNOLOGIES, INC., Haz–Mat Supply Company, Asplundh Safety Equipment Co., and David Shaggot.

#### No. 88–CV–10002–BC.

United States District Court,
E.D. Michigan, N.D.

May 29, 1990.

Craig W. Horn, Scott C. Strattard, Braun, Kendrick, Finkbeiner, Schafer & Murphy, Saginaw, Mich., for plaintiff.

Virginia S. Taylor, Christopher P. Bussert, Kilpatrick & Cody, Atlanta, Ga., and John J. McQuillan, Learman, Peters, Sarow & McQuillan, Bay City, Mich., for Abatement Technologies, Inc., Haz–Mat Supply Company, and David Shagott.

James W. Tarter, Glenn F. Doyle, Smith & Brooker, P.C., Bay City, Mich., for Asplundh Safety Equipment Co.

## OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

ROSEN, District Judge.

This lawsuit involves claims of misappropriation of trade secrets, fraud and misrepresentation, and breach of fiduciary duty.

This matter is before the Court on two separately filed Motions for Summary Judgment—one filed by Defendants Abatement Technologies, Inc., Haz–Mat Supply Company, Inc. and David Shaggot, and the other filed by Defendant Asplundh Safety Equipment Company. Defendant Asplundh Safety Equipment Company also asks the Court to impose sanctions upon the Plaintiff for violation of Fed.R.Civ.Pro. 11. The Court heard oral arguments on Defendants' Motions on May 1, 1990.

## I. FACTUAL BACKGROUND

### A. THE INTER–RELATIONSHIP OF THE PARTIES

Plaintiff AEROSPACE AMERICA, INC. ("AEROSPACE"), is a manufacturer of asbestos removal products, including an item known in the asbestos removal industry as a "negative air machine". Negative air machines operate much like ordinary vacuum cleaners. A fan and motor draw into one end of the machine air containing asbestos particles, filters out the asbestos particles, and clean air is exhausted at the other end. The machines produced by the several manufacturers that build them are essentially of the same size and shape because of the standardized shape of the filters in them and the necessity that the machine be able to fit through ordinary doorways. Like vacuum cleaners, negative air machines are mounted on wheels for easy maneuverability. AEROSPACE's negative air machine is called the "Aero–Clean 2000".

The several corporate Defendants in this action are somewhat interrelated, and involve parent corporations, subsidiary divisions, and successor corporations of various non-party corporate entities.

Defendant ASPLUNDH SAFETY EQUIPMENT COMPANY ("ASPLUNDH"), is a subsidiary division of Asplundh Tree Experts Company ("Asplundh Tree Experts"). Until 1983, Asplundh Tree Experts was engaged almost exclusively in the business of marketing tree removal equipment and related supplies.

In 1983, Asplundh Tree Experts formed the ASPLUNDH SAFETY EQUIPMENT COMPANY subsidiary division. This division was a distributor of personal protective equipment, such as, respiratory protective devices, safety glasses, disposable clothing and head protection equipment. Some of the goods marketed were "private label" items, some were those of other manufacturers.

In 1984–1985, Asplundh Tree Experts, the parent corporation, decided to get involved in the distribution of asbestos removal supplies and equipment, as well. To facilitate this market expansion, two new subsidiary divisions were formed. The first asbestos-oriented subsidiary division, Advanced Safety Technologies ("Advanced"), was formed in 1984. Then, in 1985, a second subsidiary division, Haz–Mat Supply, was created. Both of these subsidiaries marketed asbestos removal equipment and supplies manufactured by various manufacturers. Haz–Mat eventually came to carry some AEROSPACE products.[1]

---

1. Until 1985, AEROSPACE's products were distributed by a different company, Fibertech. In 1985, one of Fibertech's employees, Diane Christenberry, joined Haz–Mat, and through her, Haz–Mat acquired the AEROSPACE product line, including the "Aero–Clean 2000" negative air machine. Christenberry was originally also a named party in this lawsuit, but by stipulation, has been dismissed from this action.

Advanced Safety Technologies had "master distribution" arrangements with some of its manufacturers, i.e., Advanced would either purchase goods outright from manufacturers and re-sell them itself or would be paid large commissions by the manufacturers for the goods sold. Such a "master distribution" arrangement, in essence, made Advanced more of a "wholesale"-type distributor. Haz–Mat's relationship with manufacturers was more akin to a retail sales arrangement.

### B. MASTER DISTRIBUTION NEGOTIATIONS WITH AEROSPACE AND THE CHANGE IN MANAGEMENT/OWNERSHIP OF ASPLUNDH'S ASBESTOS–PRODUCTS SUBSIDIARIES

Defendant DAVID SHAGGOT, was initially employed by Defendant ASPLUNDH SAFETY EQUIPMENT COMPANY, as a general manager. SHAGGOT eventually got involved with promoting the Advanced Safety Technologies division and endeavored to increase the division's "master distributorship" arrangements for the wholesale-type marketing of other products. One such product that Advanced and Shaggot wanted to market under such an arrangement was the negative air machine. Since the Haz–Mat division was familiar with AEROSPACE products, and since AEROSPACE manufactured a negative air machine and was not perceived by SHAGGOT to have a strong distribution system, SHAGGOT decided to pursue a "master distributorship" arrangement with AEROSPACE.

In mid-January 1986, SHAGGOT met with Joe Goldring, an AEROSPACE consultant, to initiate discussions for a master distributorship arrangement for the "Aero–Clean 2000".

Shortly thereafter, however, the management of Asplundh Tree Experts, (the parent corporation), changed, and the new management decided to start getting out of the asbestos equipment and supply business because of product liability concerns. Upon learning about the new management's intention, SHAGGOT and some other employees of the Advanced Safety Equipment and Haz–Mat Supply divisions decided to try to pick up the asbestos removal business themselves by attempting to buy-out the Advanced Safety Equipment and Haz–Mat Supply subsidiaries. To this end, they formed their own "holding" company called Avalon Group, Inc., and formed two subsidiaries of Avalon—Defendants ABATEMENT TECHNOLOGIES, INC. ("ABATEMENT") and HAZ–MAT SUPPLY COMPANY ("HAZ–MAT").

Buy-out plans began, but SHAGGOT, meanwhile, continued to have discussions with Joe Goldring of AEROSPACE about a master distributorship arrangement for the marketing of the Aero–Clean 2000. In February, 1986, SHAGGOT and Goldring met in person for a second time. Goldring at that time gave SHAGGOT a list of the names of 12 or 13 of its distributors of the Aero–Clean 2000. SHAGGOT also told Goldring at that February 1986 meeting about the possible buy-out of the Asplundh subsidiaries and the three new companies with which he was involved. But SHAGGOT reaffirmed his interest in continuing to discuss a master distributorship relationship—either on behalf of Advanced Technologies, if the planned buy-out didn't go through, or with ABATEMENT, if it did.

On March 1, 1986, Asplundh agreed to the buy-out and on that date ABATEMENT assumed Advanced Safety Technologies distribution business and HAZ–MAT assumed Haz–Mat Supply division's business, which included the distribution of the AEROSPACE products previously distributed by Asplundh's Haz–Mat Supply division.[2]

SHAGGOT informed Goldring of the buy-out on March 26, 1986.[3]

---

**2.** During the time that HAZ–MAT distributed AEROSPACE products, HAZ–MAT requested, from time to time, certain technical information from AEROSPACE in order to respond to service inquiries from purchasers of AEROSPACE's goods.

**3.** Although Shaggot and the other former Asplundh employees' buy-out of the Asplundh sub-

In April, 1986, Murray Sutherland of AEROSPACE went to ABATE-MENT/HAZ–MAT's facilities and presented SHAGGOT with a counter-proposal for a distributorship arrangement. AERO-SPACE's counter-proposal was to make ABATEMENT an ordinary (retail-type) distributor of its Aero–Clean 2000 instead of a "master" (wholesale-type) distributor as ABATEMENT and SHAGGOT had wanted.

SHAGGOT communicated his rejection of AEROSPACE's counter-offer on May 5, 1986, and negotiations between ABATE-MENT and AEROSPACE for a "master distribution" arrangement ceased as of that date. Immediately thereafter, ABATEMENT began exploring other ways it could exclusively market a negative air machine.

## C. THE CREATION OF THE ABATE-MENT "HEPA–AIRE 2000"

Approaching other major negative air machine manufacturers (such as Critical Industries, ACTI, CRSI), was rejected because all of these manufacturers had well-established distribution systems or sold directly to asbestos removal contractors. Thus, ABATEMENT decided to pursue a relationship with a manufacturer who could build a negative air machine for ABATE-MENT under a private label. Such an arrangement was entered into in early May, 1986 with Harber Manufacturing, a Canadian company that specialized in fabricating a wide variety of aluminum products and components as private label products for other companies. Harber's manufacturing operation used advanced state-of-the-art technology including robotics and computer assisted sheet metal manufacturing.

At the request of Harber for assistance in designing and manufacturing a negative air machine, SHAGGOT sent to Harber a copy of the EPA's specifications for negative air machines from the EPA "Purple Book". The EPA Purple Book contains exact mechanical and electrical specifications as to how negative air machines

should be constructed and the performance standards that such machines must meet. SHAGGOT also sent Harber literature that he had acquired at various trade shows which included the literature put out by five or six negative air machine manufacturers about their products, including the literature put out by ACTI, Red Baron, Critical Industries and AEROSPACE. After reviewing the literature and EPA specifications, Harber asked SHAGGOT to provide it with samples of other negative air machines on the market. SHAGGOT complied with Harber's request and arranged to have CRSI's machine, Critical Industries' machine, and AEROSPACE's "Aero–Clean 2000" delivered to Harber.

Harber then constructed a prototype negative air machine for ABATEMENT. The prototype was unveiled as the "Hepa–Aire 2000" at the National Asbestos Conference trade show held in New Orleans in early October 1986. Being only a prototype and not yet commercially available at the New Orleans trade show, ABATE-MENT's "Hepa–Aire 2000" did not have an owner's manual. When one of ABATE-MENT's employees, Melvin Keuch, who was working at the trade show asked what he was to do if an owner's manual was needed, SHAGGOT told him that if they needed one, they "could get one from the AEROSPACE Aero–Clean 2000 because the Hepa–Aire 2000 was an exact copy".

ABATEMENT's "Hepa–Aire 2000" was made commercially available at the end of October 1986. HAZ–MAT purchased the Hepa–Aire 2000 from ABATEMENT for distribution in late January—early February 1987. HAZ–MAT continued to distribute AEROSPACE's products, including the Aero–Clean 2000, for a few months thereafter.

## II. PROCEDURAL HISTORY OF THIS LAWSUIT

Plaintiff AEROSPACE initially filed this action in January 1988, alleging as the basis of this Court's jurisdiction a federal

sidiaries was effective as of March 1, 1986, Shaggot remained on Asplundh's payroll until June 1, 1986.

question. (Plaintiff's original Complaint contained a Count for violation of the Lanham Act, as well as pendent state law claims for fraud and misrepresentation, misappropriation of trade secrets and breach of fiduciary duty). On April 26, 1988, the Court dismissed Plaintiff's Complaint without prejudice based on improper venue. Plaintiff subsequently refiled its action in the form of a "First Amended Complaint" on May 27, 1988.

In its First Amended Complaint, Plaintiff eliminated its Lanham Act Count, alleged only state law claims and alleged as basis of jurisdiction diversity of citizenship, thereby bringing the action within subsection (a) of the venue statute, 28 U.S.C. § 1391(a). By so doing, Plaintiff cured the venue problem since in diversity cases venue is proper not only in the district where all of the defendants reside or where the claim arose (as is the case with federal question cases, see 28 U.S.C. § 1391(b)), but also where the plaintiff resides (AEROSPACE is a resident of the Eastern District of Michigan).[4]

### III. PLAINTIFF'S CLAIMS

In its First Amended Complaint, Aerospace asserts two Counts—Count I is captioned "Fraud and Misrepresentation" and Count II is captioned "Breach of Fiduciary Duty and Misappropriation of Trade Secrets".

Plaintiff contends, in essence, that the Defendants misrepresented to Aerospace that they wanted to enter into a master distribution agreement for the distribution of the Aero–Clean 2000,[5] that they needed to review a list of Aerospace's distributors of the Aero–Clean 2000 to determine whether such a master distribution agreement was feasible, and that they needed to review technical wiring information for the Aero–Clean 2000 to respond to service inquiries from their purchasers of that product. Plaintiff further contends that list of names of distributors and the technical in-

formation constitute "confidential information". Plaintiff further argues that, as a result of the distributor/distributee relationship, Defendants were under a fiduciary duty not to disclose to others or take advantage of the purportedly confidential distributor list/technical wiring information provided.

Plaintiff's position is that ABATEMENT's "Hepa–Aire 2000" is so similar to its "Aero–Clean 2000" and was developed in what it contends was so short a period of time after the master distribution negotiations ended that the Hepa–Aire 2000 was developed by using the technical wiring information provided by Plaintiff to Defendants and that Defendants have marketed the Hepa–Aire 2000 by using Plaintiff's list of distributors of its Aero–Clean 2000. Thus, Plaintiff argues that it has profited from its breach of fiduciary duty and its misappropriation of trade secrets.

Plaintiff seeks monetary damages for fraud and misrepresentation, and seeks the imposition of a constructive trust on Abatement's profits from the Hepa–Aire 2000 as well a monetary judgment against the Defendants, jointly and severally, in the amount of those profits.

### IV. BASES OF DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Defendants contend that there is no genuine issue of material fact that they never made any false promises or representations to Plaintiff and that Plaintiff never relied on any allegedly false promise or representation. They further contend that the information provided by Plaintiff to them (i.e., the list of distributors and the technical wiring information concerning the Aero–Clean 2000) was not confidential information or "trade secrets", and that no fiduciary or confidential relationship was created by virtue of their dealings with Plaintiff, as a matter of law.

---

4. Complete diversity is present in this case since Plaintiff is a citizen of the State of Michigan and the Defendants are all citizens of other states (i.e., Georgia and Pennsylvania).

5. Plaintiff originally included one other product, the "Aero Porter-Shower" as one of the objects of this action but by stipulation, has eliminated all of its claims as to that product.

Defendant Asplundh raises the same arguments as to the merits of Plaintiff's claims and further asserts that none of Plaintiff's claims run to Asplundh since no evidence has been presented during discovery to indicate that any information that may have been obtained by its former employee, Defendant Shaggot, during his employment with Asplundh was ever used by Asplundh to its own profit (i.e., that the claims, if any, arose after the buy-out by Shaggot, et al, of the Asplundh subsidiaries).

## V. ANALYSIS

### A. THE STANDARDS GOVERNING CONSIDERATION OF A MOTION FOR SUMMARY JUDGMENT

The standards governing a trial court's consideration of motions for summary judgment were redefined by the United States Supreme Court in three 1986 cases: *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); and *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The Sixth Circuit expressly adopted this "new era" in summary judgment practice in its recent decision in *Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir.1989), and delineated in that case the principles extracted from the 1986 Supreme Court trilogy and their progeny that are to guide trial courts in this circuit in deciding motions for summary judgment:

1. Complex cases are not necessarily inappropriate for summary judgment.

2. Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

3. The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.

4. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

5. A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

6. As on federal directed verdict motions, the "scintilla rule" applies, *i.e.*, the respondent must adduce more than a scintilla of evidence to overcome the motion.

7. The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8. The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

9. The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10. The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

886 F.2d at 1478–1480 [footnotes omitted].

The Court will decide the motions before it by application of the foregoing principles.

## 1068

### B. PLAINTIFF'S FRAUD AND MIS-REPRESENTATION CLAIM

In order to establish a claim for fraud or misrepresentation under Michigan law, a plaintiff must satisfy the following requisite elements:

(1) that the defendant made a material misrepresentation;

(2) that it was false;

(3) that when the defendant made it, he knew that it was false, or made it recklessly, without any knowledge of its truth, and as a positive assertion;

(4) that he made it with the intention that it should be acted upon by the plaintiff;

(5) that the plaintiff acted in reliance upon the false misrepresentation; and

(6) that the plaintiff thereby suffered injury.

*Hi-Way Motor Co. v. International Harvester Co.,* 398 Mich. 330, 247 N.W.2d 813, 816 (1976). Each of the above elements must be proved by plaintiff by clear, satisfactory and convincing evidence. *Youngs v. Tuttle Hill Corp.,* 373 Mich. 145, 147, 128 N.W.2d 472 (1964); *Hi-Way Motor Co. v. International Harvester Co., supra,* 398 Mich. at 336, 247 N.W.2d 813. All of the elements must be found to exist; the absence of any one of them is fatal to recovery. *Id.*

■ In assessing the substantive sufficiency of a plaintiff's fraudulent misrepresentation claims for purposes of a motion for summary judgment, the court is to apply the standards of Fed.R.Civ.Pro. 56 with particular fidelity because the elements of fraud may not be presumed but must be proven, ultimately with special clarity and particularity. *Kearns v. Ford Motor Co.,* 203 U.S.P.Q. 884, 887 (E.D.Mich.1978) (Pratt, J.).[6] Thus, courts frequently find

fraud and misrepresentation claims properly resolved via summary judgment because of the inability of the plaintiff to meet its burden of proof as to each of the requisite elements. *See, e.g., Kahn v. Burman,* 673 F.Supp. 210, 214–215 (E.D.Mich.1987), *aff'd,* 878 F.2d 1436 (6th Cir.1989); *Pasternak v. Sagittarius Recording, Inc.,* 617 F.Supp. 1514, 1518–1520 (W.D.Mich.1985), *aff'd,* 816 F.2d 681 (6th Cir.1987).

■ As set forth in Paragraph 27 of Plaintiff's First Amended Complaint, Plaintiff alleges that representatives of the Defendants made the following "misrepresentations":

(1) that Asplundh/Haz–Mat was interested in becoming the sole[7] distributor of Aerospace America products;

(2) that a review of Aerospace America's distributor list was necessary in order to enable Asplundh/Haz–Mat to determine whether or not such a sole distributorship was economically feasible; and

(3) that it was necessary for Asplundh/Hazmat to review technical information such as wiring diagrams in order to respond to service inquiries from purchases.

The first two statements alleged by Plaintiff to have been false relate to the master distributorship negotiations between Defendant Abatement (and its predecessor Advanced Safety Technologies) and Aerospace. There is no factual evidence on the record which suggests that the master distributorship proposal was anything but genuine or that Abatement or its predecessor had no intention of honoring a master distribution agreement had Aerospace agreed to the proposal. Nor has Plaintiff presented any evidence to establish that Defendants did not need the distributor list information to determine whether a master

---

**6.** *See also, Street v. J.C. Bradford & Co., supra,* 886 F.2d at 1479 ("[A]ny heightened burden of proof required by the substantive law for an element of the respondent's case ... must be satisfied by the respondent."); *Anderson v. Liberty Lobby, Inc., supra,* 106 S.Ct. at 2513 ("[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden.")

**7.** As pointed out in Defendants' Brief and at oral argument, it is presumed that Plaintiff's reference to "sole" distributor is intended to mean "master" or "wholesale" distributor since no evidence has been presented that any discussions between Plaintiff and Defendants addressed the possibility of Asplundh/Haz–Mat or Abatement being Aerospace's *only* distributor of its products.

distributorship would be economically feasible or that Defendants' asserted need to review the list as indicated above was false when it was made.

In fact, Plaintiff's agent Joe Goldring, who was the individual who negotiated first-hand with David Shaggot the proposed master distribution agreement, admitted in his deposition that he knows of no *facts* to support either of the first two allegations of fraudulent misrepresentation and Plaintiff has offered nothing more than Goldring's admittedly factually unsubstantiated *opinion* that Shaggot was lying when he made the statements to support its claim. Furthermore, Plaintiff's president, Harold Milster, who also participated in the master distribution negotiations also admitted in deposition that he knows of no promises or statements made by Shaggot or any other representatives of the Defendants which were not true.

The last statement that Plaintiff claims was a fraudulent misrepresentation (i.e., that Haz–Mat needed some technical information from Aerospace to respond to service inquiries from customers) was made while Haz–Mat was a distributor of Aerospace products. Again, Plaintiff has adduced no evidence to show that the assertions that Defendants needed certain technical information to respond to their customers' service inquiries were not true.

Defendants, on the other hand, have submitted sworn affidavits to substantiate their arguments of the truth of the statements which affidavits have not been refuted by Plaintiff.

In sum, Plaintiff has presented only suspicions in support of its claim of fraud and misrepresentation and no substantial facts as to the material issues involved. In such cases, courts routinely grant defendants' motions for summary judgment. *See e.g., Pasternak v. Sagittarius Recording Co., supra.* and other Michigan federal court cases cited above.

Therefore, the Court will grant Defendants' Motion for Summary Judgment as to Count I of Plaintiff's Complaint.

## C. BREACH OF FIDUCIARY DUTY AND MISAPPROPRIATION OF TRADE SECRETS.

These two claims are actually interrelated in that the existence of a "confidential" of "fiduciary" relationship is one of the essential elements of a cause of action for misappropriation of trade secrets under Michigan law. *See, e.g., Kearns v. Ford Motor Co., supra.* Thus, rather than address the claim of "breach of fiduciary duty" separately, it is discussed herein under the appropriate sub-heading as an element of the misappropriation claim.

The three essential elements of a cause of action for misappropriation of trade secrets in Michigan are:

(1) the existence of a "trade secret";

(2) its acquisition in confidence; and

(3) the defendant's unauthorized use of it.

*Kearns v. Ford Motor Co., supra,* 203 U.S.P.Q. at 888; *Crown Industries, Inc. v. Kawneer Co.,* 335 F.Supp. 749, 762 (N.D. Ill.1971) (applying Michigan law).

### 1. *The Existence of a "Trade Secret"*

"Before there can be a betrayal of anything in the nature of a trade secret, there must be a secret." *Insealator, Inc. v. Wallace,* 357 Mich. 233, 98 N.W.2d 643, 653 (1959).

A "trade secret" may consist of any valuable formula, pattern, device, process or other information that is used in one's business and gives the possessor a competitive advantage over those who do not know or use the information. *Kubik v. Hull,* 56 Mich.App. 335, 224 N.W.2d 80, 87 (1974). The court in *Kubik,* set forth the following relevant factors for determining whether a "trade secret" exists:

(1) the existence or absence of an express agreement restricting disclosure,

(2) the nature and extent of security precautions taken by the possessor to prevent acquisition of the information by unauthorized third parties,

(3) the circumstances under which the information was disclosed by the possessor to give the recipient to the extent

that they give rise to a reasonable inference that further disclosure, without the consent of the possessor, is prohibited, and

(4) the degree to which the information has been placed in the public domain or rendered readily ascertainable by third parties through publication or unrestricted marketing.

*Id.* 224 N.W.2d at 91.

The "trade secrets" identified by Plaintiff as allegedly misappropriated by Defendants are (1) the wiring diagram for the Aero–Clean 2000 negative air machine and (2) the names of, and pricing information pertaining to four of the Aerospace distributors on the list given to Shaggot by Goldring during their master distribution agreement negotiations.[8]

**(a) The wiring diagram of the Aero–Clean 2000**

■ As explained above, information which is disclosed to the world by product marketing does not constitute a "trade secret". *Insealator, Inc., v. Wallace, supra,* 357 Mich. at 248–250, 98 N.W.2d 643; *Kubik v. Hull, supra,* 224 N.W.2d at 92. Plaintiff's agents, including its current president, admitted in deposition that there is nothing secret about the wiring diagram of the Aero–Clean 2000. In fact, Plaintiff's agents admit that the Aero–Clean 2000's wiring diagram is sent to *all* purchasers of the product along with the machine.

■ Furthermore, Plaintiff's agents admit that the company took no precautionary measures to preserve any alleged "secrecy" of the wiring information. None of Aerospace's distributors were ever given notice that this information was considered by Aerospace to be a trade secret, not to be disclosed to "non-purchasers". More importantly, Aerospace never notified Defendants that it considered the wiring diagram to be "secret" and never requested Defendants to sign any "confidentiality" or "non-disclosure/non-use" agreement.

Moreover, Plaintiff's agents admit that all negative air machines must comply with the EPA Purple Book which contains the specifications for negative air machines; and wiring diagrams are available from the U.S. Patent Office of negative air machines that have been patented. Plaintiff, therefore, cannot establish that the *wiring diagram* "partook of sufficient newness or originality to represent a secret process or trade secret" under Michigan law. *Manos v. Melton,* 358 Mich. 500, 100 N.W.2d 235 (1960).

**(b) The distributor information**

■ Similarly, Aerospace's distributor information was not secret to persons in the asbestos removal industry. These distributors openly advertised in trade publications (including in advertisements their prices), participated in industry associations and heavily promoted the products they distributed—including Plaintiff's products—at trade shows. Plaintiff's own president, Murray Sutherland, admitted that it is Plaintiff's own practice to contact all distributors of asbestos removal equipment to find out whose equipment they are promoting and that "smart" competitors would do likewise. In *Blue Cross & Blue Shield of Michigan v. Insurance Bureau,* 104 Mich.App. 113, 304 N.W.2d 499 (1981), the Michigan Court of Appeals held that where price information was readily ascertainable by contacting the plaintiff's vendors or providers directly, such information did not constitute a "trade secret".

**2. *Confidential Disclosure***

■ Even assuming, *arguendo,* that Plaintiff's wiring diagram or distributor list information fits the legal definition of a "trade secret", a "confidential" relationship is a prerequisite to any recovery for misappropriation of it. Unless a confidential relationship existed between the parties at the time of Plaintiff's disclosure of the alleged trade secret, Defendants use of

---

**8.** Plaintiff also identified during discovery one other alleged "trade secret", i.e., technical information relating to a certain "magnahelic gauge" on the AERO–CLEAN 2000, as having been misappropriated by Defendants. However, at oral argument, Plaintiff conceded that the gauge information is not a trade secret and, therefore, withdrew all claims concerning it.

that information is not actionable. *Kearns v. Ford Motor Co., supra,* 203 U.S.P.Q. at 888.

■ Confidential relationships may be found to exist either by virtue of an express confidentiality non-use/non-disclosure agreement (wherein the disclosure warns the disclosee that information received by the disclosee is to be held in confidence, *Crown Industries, Inc. v. Kawneer Co., supra,* 335 F.Supp. at 762) or, in appropriate circumstances, may be implied by law.

■ Here, Plaintiff openly admits that it never informed Defendants' representatives of the alleged "trade secret" nature of the information at the time it was allegedly disclosed, nor were they instructed not to use or disclose it. Thus, if a "confidential" relationship exists at all, the relationship between the parties must be of the type of relationship which creates a "confidential" or "fiduciary" duty by operation of law.

Plaintiff contends that the parties' manufacturer-distributor relationship (while Defendant Haz–Mat distributed Aerospace products) is the type of relationship which implicitly creates a "confidential" or "fiduciary" relationship. Plaintiff is mistaken. Courts have repeatedly rejected the proposition that a fiduciary relationship or obligation exists between a manufacturer and a distributor of its products. *See e.g., W.K.T. Distributing Co. v. Sharp Electronics Corp.,* 746 F.2d 1333, 1336–1337 (8th Cir.1984); *C. Pappas Co. v. E & J Gallo Winery,* 610 F.Supp. 662 (E.D.Cal. 1985), *aff'd,* 801 F.2d 399 (9th Cir.1986).[9] As explained by the *Pappas* court, the underlying basis of a confidential relationship is the preclusion of any nonmutual profit arising from the dealings of the parties. *Id.* at 667. Clearly, the relationship of a

manufacturer and distributor, such as that of Aerospace and Haz–Mat here, does not meet this test.

Moreover, Michigan courts have been loathe to imply a "confidential" relationship in trade secret cases simply by virtue of the contract or agency relationship of the parties and instead, require that there be an explicit, at least verbal, warning that the information disclosed is confidential and/or not to be disclosed or used without authorization. *See e.g., Kubik v. Hull, supra,* where the court declined to imply a confidential disclosure of an alleged trade secret simply because the parties had an employer/employee relationship.

Here, the parties did not even have an employer/employee relationship, but rather were two independent for-profit entities. Defendant Haz–Mat was an independently owned business that purchased products outright from Aerospace America as well as other manufacturers. Haz–Mat dealt directly with its own customers in securing orders for Aerospace products. Haz–Mat billed customers in its own name on its own invoice forms, assumed all credit risks, and set its own terms for payment. Haz–Mat engaged on its own behalf in procuring business for Aerospace products and carried on its own business for itself not for Aerospace.

Plaintiff's reliance on *Hayes–Albion Corp. v. Kuburski,* 421 Mich. 170, 364 N.W.2d 609 (1984) is misplaced. That trade secret case did not involve a manufacturer-distributor relationship but rather involved application of an implied-in-law fiduciary duty created by virtue of the employer-employee relationship. Moreover, although the *Hayes–Albion* court cited the general law of implied-in-law fiduciary relationships, that law was not relied on by the court because there was a signed agree-

**9.** As Judge Pratt explained in *Kearns v. Ford Motor Co., supra,* "[A confidential or fiduciary] relationship can indeed be created implicitly.... [But] that is not to say that courts are prepared to find a confidential relationship lurking in every chance encounter. The Court must look, then, to the personal attributes of the parties and the nature of their dealings." 203 U.S.P.Q. at 888. Judge Pratt went on to distinguish the relatively short-term arms-length dealings of the well-educated, well-experienced and sophisticated plaintiff-engineer and the Defendant Ford Motor Company in that case with the typical "implied in law" fiduciary relationship, such as that of a guardian/ward over a long period of years and noted the obvious distinction between the two scenarios.

ment between the parties that set forth and established the confidential nature of the trade secret information at issue in that case.

Under the foregoing authorities, it is clear that no implicit "confidential" relationship existed between the parties. Therefore, the second requisite element of misappropriation of trade secrets is not satisfied in this case.[10]

### 3. Unauthorized "Use" of the Alleged Trade Secret

 Even assuming that Plaintiff has satisfied the first two elements for a misappropriation of trade secrets, it has produced scant factual support that Defendants "used" the trade secret information allegedly disclosed to them. Without factual support, Plaintiff merely assumes that the Abatement Hepa–Aire 2000 was created by using the information allegedly supplied to David Shaggot during the course of the master distribution negotiations.

Plaintiff's agent, Joe Goldring, admitted in deposition that all that Plaintiff has to rely on to support its claim that Defendants used the wiring/technical information supplied to Shaggot is the fact that the Hepa–Aire 2000 was built in what Goldring considered to be, in his own opinion, too short a period of time, to have been built without using the information. Goldring admitted that he has *no facts* to go on to support this proposition; all that he offered is his own personal *opinion.*

 The only "evidence" that remotely supports Plaintiff's claim of unauthorized use is the affidavit of one of Abatement's former employees, Melvin Keuch, who stated that David Shaggot told him at the fall 1986 asbestos trade show in New Orleans that if Abatement needed to refer to an owner's manual for the Hepa–Aire 2000 (which did not exist at the time) they could get one from the Aerospace Aero–Clean 2000, because the Hepa–Aire 2000 was an exact copy. However, even if Abatement's

machine is an "exact copy", as the U.S. Supreme Court stated in *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989), public domain information provided without restriction to all purchasers of a product may be copied at will. Such freedom to copy includes the right to "reverse engineer" a product (i.e., to start with the known product and working backward to divine the process which aided in its development or manufacture). Defendant Abatement admits that it delivered an Aero–Clean 2000 to its Canadian manufacturer, Harber, along with the negative air machines manufactured by other companies as well as the literature published by these other manufacturers.

Furthermore, Plaintiff's agents admit that the Aero–Clean 2000 wiring diagram is "copied" from the specifications set forth in the EPA Purple Book, a manual available to the public at-large. Given the public domain nature of Aerospace's machine and its technical information, Shaggot's alleged characterization of the Hepa–Aire 2000 as an exact copy of the Aero–Clean 2000 is hardly sufficient evidence of unauthorized use of trade secret information.

As to the four distributor names/information from the list provided to Shaggot, two of the distributors had been customers of Abatement and/or its predecessor Asplundh divisions long prior to the date of sale of any Hepa–Aire 2000 machines. As to Reis Equipment company, one of the distributors that Aerospace claims Abatement "misappropriated", discovery has disclosed that Abatement never sold any negative air machines to that firm. The fourth distributor allegedly "misappropriated"—American Health & Safety—did not purchase anything from Abatement until more than two years after the master distribution negotiations.

 In any event, other than the fact that the list of distributors was given by Goldring to Shaggot, Plaintiff has produc-

---

**10.** The failure of Plaintiff to establish the existence of a fiduciary relationship necessary entitles Defendant to Summary Judgment on Plaintiff's claim of "Breach of Fiduciary Duty"

to the extent that Plaintiff asserts such a separate claim independent of its claim for "Misappropriation of Trade Secrets".

ed no evidence whatsoever other than its *bare assumption* that Shaggot must have used the list since Abatement sold a few machines to two or three of the dozen or so names on the list at some point in time since the negotiations for the master distribution arrangement fell through. Such conclusory allegations are insufficient to withstand summary judgment, particularly in this case, where it is undisputed that the Defendants were engaged in the asbestos removal business, by virtue of their relationship with their predecessor corporation, Defendant Asplundh, and its subsidiaries for a number of years prior to the master distribution negotiations, and their general involvement with trade associations, conferences, etc. which pre-date the contacts that Defendant Shaggot had with Plaintiff and its agents.

### CONCLUSION

In view of these reasons, Defendants' Motions for Summary Judgment be granted. However, Defendant Asplundh's Motion for Sanctions will not be granted because its Motion for Summary Judgment/Motion for Sanctions is based solely upon its argument that the ultimate alleged "use" of the trade secrets was by Defendant Abatement after Shaggot, et al., severed their relationship with Asplundh and its subsidiaries (by virtue of their buy-out of the two Asplundh divisions) and Asplundh never profited from such alleged "use".

Given the facts that all of the parties were at one time Asplundh affiliates and that Shaggot remained on the Asplundh payroll and, thus, apparently did have some undefined relationship with Asplundh for some months after the March 1, 1986 buy-out, and given the fact that Shaggot initially entered into the master distribution negotiations with Aerospace while he was employed by Asplundh (or, at least, one of its subsidiaries) and indeed admits that he represented to Goldring that he wanted a master distribution agreement with Aerospace either on behalf of Abatement if the buy-out went through or with one of the Asplundh subsidiaries if it did not, it cannot be said that Aerospace's naming of As-

plundh as a party to this suit was not done in "good faith" in violation of Fed.R.Civ. Pro. 11.

Accordingly, IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment be, and hereby are, GRANTED.

IT IS FURTHER ORDERED that Defendant Asplundh Safety Equipment Company's Motion for Sanctions be, and hereby, is DENIED.